[No. 57391-3.. En Banc. May 7, 1992.]

*In the Matter of the Personal Restraint of*
DAVID LEWIS RICE, *Petitioner.*

878

*Monte E. Hester* and *Wayne C. Fricke* of *Law Offices of Monte E. Hester, Inc., P.S.; Thomas W. Hillier II* and *Peter Offenbecher* of *Federal Public Defender for the Western District of Washington,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Donna L. Wise, Senior Appellate Attorney,* for respondent.

DURHAM, J. — In *State v. Rice,* 110 Wn.2d 577, 757 P.2d 889 (1988), *cert. denied,* 491 U.S. 910 (1989), this court affirmed David Rice's convictions and death sentence on four counts of aggravated first degree murder. We later dismissed Rice's first personal restraint petition by an unpublished order. In re Rice, cause 54575-8 (Aug. 3, 1989). Rice has filed this second personal restraint petition, principally arguing that the prosecution withheld — and his attorneys otherwise failed to discover — evidence of his mental condition which would have been favorable to him in the penalty phase of his trial. He seeks either a reversal of the sentence and retrial of the penalty phase or an order transferring the petition to the superior court for a reference hearing pursuant to RAP 16.11(b) and 16.12. In the alternative, Rice presents several additional grounds for relief, which he claims entitle him to vacation of the conviction and sentence, and a new trial. For reasons discussed below, we deny the request for a reference hearing and dismiss the petition.

### FACTS
Since we fully stated the facts of this case in *State v. Rice, supra,* we will not repeat them in detail here. On Christmas Eve of 1985, Rice gained entry into the home of attorney Charles Goldmark by posing as a delivery man and displaying a toy gun. He took Goldmark, his wife Annie, and their two sons, to an upstairs bedroom. Upon learning that guests would soon be arriving, he rendered them unconscious with chloroform. He then beat them over their heads

with a steam iron and stabbed them with a knife. Annie Goldmark died at the scene, while the others died at various times within the next 5 weeks.

Police apprehended Rice on December 26, 1985, and he gave a complete confession. The State charged him with four counts of aggravated first degree murder, and sought the death penalty. Rice entered a general plea of not guilty as well as a plea of not guilty by reason of insanity.

There was no question at trial that Rice had committed the murders. Rice's defense was that he was unable to fully distinguish between right and wrong because he possessed delusional ideas about an imminent communist invasion of the United States. Rice contended that he believed he was a "soldier" in a battle against communism and that he thought that what he had done was right.

Dr. Kenneth Muscatel, a clinical psychologist appointed by the trial court as requested by the defense, opined that Rice was "an extremely disturbed man". Dr. Muscatel explained that Rice was not truly delusional but "was nonetheless suspicious, felt that the world is a hostile place, felt that the world would do wrong to him if the opportunity was provided." Dr. Muscatel diagnosed Rice as having a "schizotypal personality disorder"; that is, "a personality disorder with schizoid or schizophrenic-type features, but not reaching the level or degree of a schizophrenic disorder, a chronic psychotic disorder." Rather, he described Rice's condition as a "severe and chronic disorder of personality functions." Dr. Muscatel believed that Rice's confused thinking and weak ego boundaries, combined with the tacit encouragement of people around Rice who shared his extreme political views, led him to believe that what he had done was justified.

Nonetheless, Dr. Muscatel opined that Rice was legally sane when he committed the crimes. In reference to the ability to distinguish right from wrong, Dr. Muscatel testified that the planning leading up to the crimes, the manner in which Rice committed the crimes, his actions following the crimes, and the statements he made to others all indi-

cated that he was able to appreciate that what he had done was wrong, even though he might have felt that his actions were justified.

The prosecution focused on Rice's conduct and statements following arrest to support its theory that Rice's purported mental disorder was largely a recent fabrication. After his arrest, Rice was calm and coherent and did not mention any of the delusional beliefs which later surfaced as purported reasons for the killings. A psychiatric evaluation specialist at the King County Jail, who administered a Minnesota Multiphasic Personality Inventory on Rice, testified that neither the test results nor observations of Rice indicated that he had any psychiatric disorder or that he suffered from any delusions or other thought disturbances. Rather, the specialist said, Rice had more of a character disorder indicating a cold, distant, and self-centered personality.

The prosecution pointed out these inconsistencies in its closing argument. It also emphasized that greater reliance should be placed on the statements Rice made soon after his arrest than on those he made months later in support of his mental illness defense.

The jury found Rice guilty as charged. At the penalty phase, the defense presented no new evidence of Rice's mental condition, but again emphasized that condition during closing argument. The defense also presented testimony by members of Rice's family to show that he had suffered a troubled childhood but had never been violent. The jury nonetheless found insufficient mitigating circumstances to merit leniency, and the court sentenced Rice to death.

Following this court's dismissal of Rice's first personal restraint petition, the trial court set an execution date of November 1, 1989. On October 23, 1989, Rice filed a petition for writ of habeas corpus in the United States District Court. The execution date was stayed, and the District Court appointed counsel for Rice and ordered that he be examined by three psychiatrists to determine his current competency to assist in his defense as well as his competence at time of sentencing and appeal.

While the federal action was pending, Rice filed this second personal restraint petition on July 23, 1990. In his petition, Rice raises numerous issues, but he mainly argues that the prosecution withheld favorable evidence on his mental condition, and that his trial counsel was ineffective in failing to discover this evidence. Rice's allegations specifically concern a diagnosis purportedly made by Dr. G. Christian Harris, a psychiatrist whom the State had retained to assist the prosecution. On June 6, 1986, the day after the jury found Rice guilty, Dr. Harris wrote the prosecutors a letter opining that Rice was not particularly suggestible and was not legally insane when he committed the murders. (See appendix.) Rice's present attorneys now allege that they first discovered in the spring of 1990 that, at the time of trial, Dr. Harris had also diagnosed Rice as suffering from a condition called "paranoid delusional disorder". They further allege that the prosecution knew of this designation and failed to disclose it to Rice's trial counsel. Rice argues that Dr. Harris' evaluation would have bolstered his claim that he suffered from a severe mental disorder which justified sparing his life.

The State did not file a response to Rice's petition pursuant to RAP 16.9, but filed only an answering brief under RAP 16.10(b). In its brief, the State did not contest the fact of Dr. Harris' alleged diagnosis. Instead, the State focused on the materiality of any such evidence, arguing that disclosure was not required.

In order to facilitate the evaluation of Rice's claims, this court directed Rice's attorneys to provide a more detailed statement of the facts upon which they based their allegations and the evidence available to support them, pursuant to RAP 16.7(a). The court also directed the State to file a response answering the allegations and identifying the disputed questions of fact.

The materials Rice provided indicate that Dr. Harris had, in fact, diagnosed Rice as suffering from paranoid delusional disorder in addition to the opinion expressed in his letter. In the spring of 1990, pursuant to the Federal Dis-

trict Court's order, three appointed psychiatrists filed reports on Rice's mental competency, including Dr. Harris, whom the State had selected. Rice's attorney, Peter Offenbecher, learned of Dr. Harris' designation of "paranoid delusional disorder" at that time. In his current report, Dr. Harris opined that Rice suffers from a continuing paranoid delusional disorder and that he had suffered from that disorder at the time of his trial. At a hearing before the District Court, Dr. Harris confirmed this diagnosis. Offenbecher asserts that he personally contacted Dr. Harris and that Harris said he had diagnosed Rice as suffering from paranoid delusional disorder when he first examined Rice in 1986. Dr. Harris declined to discuss the matter further, however, because he had been retained by the State in connection with the federal proceeding.

Rice also offered the affidavits of his trial attorneys, Bill Lanning and Anthony Savage. Mr. Savage says that he believes he saw the June 6, 1986, letter expressing Dr. Harris' opinion to the prosecutors prior to the penalty phase. Both attorneys aver that the prosecution did not disclose Dr. Harris' additional diagnosis to them, that had they known of the designation, they would have contacted Dr. Harris in anticipation of having him testify at the penalty phase, and that such evidence would have been critical in making a case for leniency and rebutting the State's argument that Rice had fabricated his mental illness.

Finally, attorney Offenbecher asserts that at a reference hearing he would offer the prosecutors' testimony and records, which he believes would reveal that the prosecution knew of Dr. Harris' diagnosis of paranoid delusional disorder and failed to disclose it to defense counsel.

In its response, the State presented the declaration of King County Superior Court Judge William Downing, who was senior deputy prosecuting attorney during Rice's trial. Judge Downing explains that in the spring of 1986, the prosecution hired Dr. Harris to assist in preparing for cross examination of Rice's witnesses. To this end, Dr. Harris

reviewed Dr. Muscatel's report and underlying materials. According to Judge Downing, attorney Savage "had a long-standing relationship" with Dr. Harris and "was pleased to be getting Dr. Harris more involved in the case." Mr. Savage, therefore, "facilitated" Dr. Harris' visits with Rice in jail. Judge Downing states that the prosecution still did not intend to call Dr. Harris as a witness at that stage of the proceedings, except possibly to rebut further defense expert testimony. Judge Downing specifically declares that the prosecution "never requested any 'diagnosis' from Dr. Harris and he did not ever provide us with one, either orally or in his written report." He says that Dr. Harris' letter of June 6, 1986, regarding Rice's sanity and suggestibility, answered the only questions posed to him and that defense counsel received a copy of the letter.

The State continued to argue that Dr. Harris' additional diagnosis would not have altered the outcome of the penalty phase even if it had been presented to the jury.

Based on these materials, Rice asks this court to reverse his death sentence or direct the Superior Court to hold a reference hearing on his allegations. Meanwhile, the federal District Court has stayed the habeas corpus proceeding until 21 days after this court issues its decision on this petition.

## I

██ ██ Before reaching the merits of Rice's claims, we articulate certain principles of review applicable to personal restraint petitions. First, Rice must show, as to each claimed constitutional error which he did not raise on direct appeal, that he was actually prejudiced by the error. *In re Hews*, 99 Wn.2d 80, 87, 660 P.2d 263 (1983). To the extent Rice initially raises issues that are not of constitutional magnitude, he must show that the claimed error "constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *In re Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990).

■ This court has three options regarding constitutional issues raised in a personal restraint petition:

1. If a petitioner fails to meet the threshold burden of showing actual prejudice arising from constitutional error, the petition must be dismissed;

2. If a petitioner makes at least a prima facie showing of actual prejudice, but the merits of the contentions cannot be determined solely on the record, the court should remand the petition for a full hearing on the merits or for a reference hearing pursuant to RAP 16.11(a) and RAP 16.12;

3. If the court is convinced a petitioner has proven actual prejudicial error, the court should grant the Personal Restraint Petition without remanding the cause for further hearing.

*Hews*, at 88.

If a defendant's first personal restraint petition is dismissed, he may not file another petition for "similar relief" absent a showing of "good cause". RAP 16.4(d). Specifically, issues that have previously been "heard and determined" will not be entertained without good cause, and a "new" issue will not be considered if raising that issue in a subsequent petition constitutes an abuse of the writ process. *In re Jeffries*, 114 Wn.2d 485, 487-88, 789 P.2d 731 (1990). It is an abuse of the writ if the defendant was represented by counsel throughout the postconviction proceedings and he raises a new issue that was " 'available but not relied upon in a prior petition.' " *Jeffries*, at 492 (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 444 n.6, 91 L. Ed. 2d 364, 106 S. Ct. 2616 (1986)).[1]

■ ■ Finally, we take this opportunity to explain more fully the showing petitioners must make to support a request for a reference hearing. As a threshold matter, the petitioner must state in his petition the facts underlying the

---

[1] A recently enacted statute says that "new grounds" may be raised in a subsequent personal restraint petition upon a showing of "good cause". RCW 10.73.140. This is consistent with the rule articulated in *In re Jeffries, supra*, with regard to "new" issues. The statute seems to further suggest, however, that a subsequent petition may never raise grounds "similar" to those raised in the first petition. The parties have not addressed whether the new statute alters the *Jeffries* standards, nor is it necessary to decide that question in this case.

claim of unlawful restraint and the evidence available to support the factual allegations. RAP 16.7(a)(2)(i). This does not mean that every set of allegations which is not meritless on its face entitles a petitioner to a reference hearing. Bald assertions and conclusory allegations will not support the holding of a hearing. *See In re Williams*, 111 Wn.2d 353, 364-65, 759 P.2d 436 (1988). Rather, with regard to the required factual statement, the petitioner must state with particularity facts which, if proven, would entitle him to relief.

As for the evidentiary prerequisite, we view it as enabling courts to avoid the time and expense of a reference hearing when the petition, though facially adequate, has no apparent basis in provable fact. In other words, the purpose of a reference hearing is to resolve genuine factual disputes, not to determine whether the petitioner actually has evidence to support his allegations. Thus, a mere statement of evidence that the petitioner *believes* will prove his factual allegations is not sufficient. If the petitioner's allegations are based on matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief. If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence. The affidavits, in turn, must contain matters to which the affiants may competently testify. In short, the petitioner must present evidence showing that his factual allegations are based on more than speculation, conjecture, or inadmissible hearsay.

Once the petitioner makes this threshold showing, the court will then examine the State's response to the petition. The State's response must answer the allegations of the petition and identify all material disputed questions of fact. RAP 16.9. In order to define disputed questions of fact, the State must meet the petitioner's evidence with its own competent evidence. If the parties' materials establish the existence of material disputed issues of fact, then the superior

court will be directed to hold a reference hearing in order to resolve the factual questions.

With these principles in mind, we turn to the main issues Rice raises in his petition. We note that, in this regard, Rice makes no claim of error impacting the guilt phase of his trial, but confines his claims to the penalty phase.

## II

As discussed above, Rice asserts that, prior to the penalty phase, Dr. Harris diagnosed him as suffering from "paranoid delusional disorder". He argues that the prosecution knew of this diagnosis and failed to disclose it to defense counsel, thus depriving him of a fair trial.

■ It is well established that the prosecution has an obligation to turn over evidence in its possession or knowledge which is both favorable to the defendant and material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963); *United States v. Bagley*, 473 U.S. 667, 674, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987). This so-called *Brady* rule is based on the requirement of due process. *Bagley*, at 675. Because the rule's purpose is to prevent a miscarriage of justice, the prosecution need only disclose evidence favorable to the accused which, if suppressed, would deprive the defendant of a fair trial. *Bagley*, at 675. Therefore, if the prosecution has withheld favorable evidence within its possession, the determinative question is if the evidence was "material" to guilt or punishment. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, at 682; *Ritchie*, at 57. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, at 682.[2]

---

[2]Rice argues that the prosecution presented a "false impression" about the psychological evidence and, therefore, must prove "beyond a reasonable doubt" that the error did not contribute to the verdict. This test only applies to the knowing use of perjured testimony, however. *Bagley*, at 678-80. There is no evidence that the prosecution knowingly used perjured testimony regarding Rice's mental condition.

■ Based on all the materials that Rice and the State have presented, including those submitted in response to our request, we will assume that Dr. Harris did diagnose Rice as suffering from paranoid delusional disorder prior to the penalty phase. Nonetheless, Rice has presented no evidence that the prosecutors knew of this diagnosis, other than his attorney's unsupported "belief" that the prosecutors would so testify. This is not a sufficient showing. Judge Downing stated that the prosecution did not ask Dr. Harris for a designation of Rice's mental condition nor did it receive one, either orally or in writing. Rice has presented no evidence which suggests otherwise.

If the prosecution did not know of the additional diagnosis, it had no duty to disclose it or to inquire further. *State v. Judge*, 100 Wn.2d 706, 717, 675 P.2d 219 (1984). Therefore, Rice has not met the threshold requirement of presenting prima facie evidence to support his failure to disclose claim. *In re Williams*, 111 Wn.2d at 365. Consequently, we deny the request for a reference hearing on that claim.

■ Rice next argues that the failure of his trial counsel to discover Dr. Harris' additional diagnosis deprived him of effective assistance. A criminal defendant's constitutional right to counsel includes the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). The fundamental question in judging any claim of ineffective assistance is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, at 686. To prevail on such a claim, the defendant must show both ineffective representation and resulting prejudice. *State v. Mak*, 105 Wn.2d 692, 731, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986).

The first element is met by showing that counsel's conduct fell below an objective standard of reasonableness. *Strickland*, at 687-88. In this regard, the court must make every effort to eliminate the distorting effects of hindsight and must strongly presume that counsel's conduct consti-

tuted sound trial strategy. *Strickland*, at 689. Counsel has a duty to make reasonable investigations or to make a reasonable decision that particular investigations are unnecessary. *Strickland*, at 691. In an ineffectiveness case, a particular decision not to investigate must be assessed for reasonableness under all the circumstances. *Strickland*, at 691.

The second element of an ineffective assistance claim is met by the same test as is applicable to a failure to disclose claim; that is, whether there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Strickland*, at 694. In this particular case, there must be a reasonable probability that the jury would have concluded that the balance of aggravating and mitigating factors did not warrant a sentence of death. *Strickland*, at 694.

A reviewing court need not address whether counsel's performance was deficient if it can first say that the defendant was not prejudiced. *Strickland*, at 697. No evidentiary hearing is required in a collateral proceeding if the defendant fails to allege facts establishing the kind of prejudice necessary to satisfy the *Strickland* test. *Hill v. Lockhart*, 474 U.S. 52, 60, 88 L. Ed. 2d 203, 106 S. Ct. 366 (1985).

After thoroughly examining the record and the materials Rice has presented, we conclude that Rice has not presented sufficient facts or evidence to establish a prima facie case of ineffective assistance under the *Strickland* test.

Rice has not established that his trial attorneys acted unreasonably in connection with Dr. Harris' opinions. The evidence shows that attorney Savage knew that Dr. Harris had evaluated Rice. While Mr. Savage had received a copy of Dr. Harris' June 6, 1986, report regarding Rice's legal sanity and suggestibility, he was unaware that Dr. Harris had also diagnosed Rice as suffering from paranoid delusional disorder. We can conceive of sound reasons for not inquiring further of Dr. Harris under the circumstances then known to defense counsel. The defense based its plea for leniency primarily on two statutory mitigating factors:

that Rice committed the murders while he "was under the influence of extreme mental disturbance" and that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law had been "substantially impaired as a result of mental disease or defect". RCW 10.95.070(2), (6). The defense already had presented to the jury Dr. Muscatel's opinion that Rice was "an extremely disturbed man, who has both schizoid and paranoid features." Rice's trial attorneys had no reason to believe that Dr. Harris might have made any diagnosis more favorable to the defense. Since Dr. Harris had been hired to assist the State and had submitted a letter in favor of the State's position, defense counsel had every reason to believe that Dr. Harris would be hostile to their case.

Even if the defense attorneys had known of Dr. Harris' designation of "paranoid delusional disorder", they still may have decided not to have him testify. Had they called Dr. Harris to the stand, the State doubtless would have presented Harris' opinion that Rice was neither overly suggestible nor legally insane, thereby contradicting Rice's primary defense that he did not appreciate the wrongfulness of his conduct. We find it significant that, in their averments to this court, both defense attorneys say only that, had they known of the additional diagnosis, they would have contacted Dr. Harris "in anticipation" of having him testify. They do not say that they would have actually called Dr. Harris to the stand. We cannot say that defense counsel's conduct was unreasonable; to the contrary, it appears eminently skillful.

Rice also fails to show that there is a reasonable probability that, had the jury heard Dr. Harris' diagnosis, it would have decided differently. In describing the nature of "paranoid delusional disorder", Rice relies on the *Diagnostic and Statistical Manual of Mental Disorders*, which states that the primary feature of "Delusional (Paranoid) Disorder" is "the presence of a persistent, nonbizarre delusion that is not due to any other mental disorder, such as Schizophrenia, Schizophreniform Disorder, or a Mood Disorder." American

Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 199 (3d rev. ed. 1987) (hereinafter DSM-III-R). Apart from the delusion and its ramifications, "behavior is not obviously odd or bizarre" and auditory or visual hallucinations are not prominent. DSM-III-R, at 199. The most common type is the "persecutory type", which "usually involves a single theme or series of connected themes, such as being conspired against, cheated, spied upon, followed, poisoned or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals." DSM-III-R, at 200. People with this type of disorder "are often resentful and angry, and may resort to violence against those they believe are hurting them." DSM-III-R, at 200. Even when the disorder is chronic, however, intellectual and occupational functioning are usually satisfactory, although social and marital functioning are often impaired. DSM-III-R, at 200-01. "A common characteristic of people with Delusional Disorder is the apparent normality of their behavior and appearance when their delusional ideas are not being discussed or acted upon." DSM-III-R, at 201.

These symptoms are substantially similar to the symptoms Dr. Muscatel described at trial when he diagnosed Rice as suffering from "schizotypal personality disorder". The description of that disorder in the DSM-III-R overlaps the description of paranoid delusional disorder in numerous respects. For instance, persons suffering from schizotypal personality disorder may exhibit "paranoid ideation", "suspiciousness", "odd beliefs", "eccentric convictions", and impaired interpersonal relationships. DSM-III-R, at 340-41. The symptoms of Rice's condition that Dr. Muscatel described at trial fall well within the textbook descriptions of both schizotypal personality disorder and paranoid delusional disorder. Examples include Rice's paranoia, increased anger and suspiciousness, failed relationships, and grandiose fantasies. At the hearing before the Federal District Court in May 1990, Dr. Harris said that Rice's paranoid delusional disorder was characterized by "thoughts that were of a bizarre and of a

persecutory nature", symptoms which fit as well within the description of schizotypal personality disorder.[3]

Rice argues that Dr. Harris' designation might have explained his outward normality following his arrest, since a common feature of persons with paranoid delusional disorder "is the apparent normality of their behavior and appearance when their delusional ideas are not being discussed or acted upon." DSM-III-R, at 201. Dr. Muscatel never suggested, however, that Rice's mental disorder prevented him from appearing to act normally on most occasions. Indeed, on redirect examination, Dr. Muscatel testified that many of the points that the prosecution raised about Rice's behavior — his deliberate lying, his rationalization, his apparent emotional calm, and his intelligence — were not inconsistent with the existence of a mental disorder. Therefore, Dr. Muscatel's testimony covered the same points which the defense now suggests Dr. Harris might have addressed.

Rice also argues that Dr. Harris might have been more credible to the jurors, both because the State had retained him and because he is a psychiatrist, while Dr. Muscatel is a clinical psychologist. The prosecution did not dispute that Dr. Muscatel was fully qualified to evaluate Rice and offer an opinion on his psychiatric condition, however. In fact, the prosecution relied on Dr. Muscatel's testimony in its closing argument. Moreover, even if the jury believed that Rice had a mental disorder (which it may have in any event), we are satisfied that, in view of all the evidence, there is no reasonable probability the jury would have found that Rice merited leniency.

---

[3]We also observe that the authors of the DSM-III-R caution that "[t]here is no assumption that each mental disorder is a discrete entity with sharp boundaries (discontinuity) between it and other mental disorders, or between it and no mental disorder." DSM-III-R, at xxii. Dr. Muscatel himself testified that he had "great difficulty" placing Rice in a diagnostic category. Rice has presented no materials suggesting that "paranoid delusional disorder" is a more severe disorder than "schizotypal personality disorder", or that one condition might have affected his behavior in a significantly different manner than the other.

In short, Rice simply has not explained how Dr. Harris' diagnosis could have helped him. Dr. Muscatel's testimony made the point that Rice sought to make: that he suffered from a severe mental disorder which affected his actions on the night of the murders. We are not persuaded that labeling that condition as "paranoid delusional disorder" or offering further evidence of a disorder could have affected the outcome of the penalty phase.

 Finally, given our disposition of the *Brady* claim, we must consider whether the result here would be different under the standards for newly discovered evidence. One of the available grounds for granting a personal restraint petition is the existence of material facts "which have not been previously presented and heard, which in the interest of justice require vacation of the . . . sentence". RAP 16.4(c)(3). Although Rice has not directly raised this ground for relief, we wish to make clear that Dr. Harris' diagnosis would not entitle Rice to relief on this ground. Relief would be merited only if, among other things, the "new" evidence "would probably have changed the outcome" of the trial. *In re Jeffries*, 114 Wn.2d 485, 493, 789 P.2d 731 (1990). It is quite clear from the foregoing discussion that Rice cannot show that Dr. Harris' diagnosis probably would have changed the outcome of the penalty phase.

In conclusion, Rice has not presented sufficient evidence that Dr. Harris' designation of "paranoid delusional disorder" would have affected the jury's decision in the penalty phase. Because Rice has failed to make a prima facie showing that he was prejudiced, we will not order a reference hearing.

### III

 The remaining issues that Rice raises were available to him on appeal and in his first personal restraint petition, and he asserts no good cause for not raising them previously. Therefore, to raise them now constitutes an abuse of the writ. *In re Jeffries, supra* at 492. Nonetheless, we will briefly discuss the merits of each claim.

■ 1. Adequacy of Mental Examination. Rice argues that Dr. Muscatel's psychological evaluation was constitutionally inadequate because defense counsel failed to follow Dr. Muscatel's recommendation to obtain other evaluations. Even if Dr. Muscatel recommended further evaluations, however, there is no evidence that Dr. Muscatel's evaluation was itself inadequate. Rice would find evidence of inadequacy in the fact that Dr. Muscatel's diagnosis apparently differed from Dr. Harris'. Given the wide latitude for differing opinions in the mental health field, the mere fact that one expert's opinion differs from another's is not evidence that one of the opinions is incompetent. *See State v. Harris*, 114 Wn.2d 419, 440-41, 789 P.2d 60 (1990).

■ 2. Violation of Medical Privilege. Rice next argues that the prosecution improperly obtained his jail mental health records and improperly interviewed jail mental health personnel without notifying his counsel, obtaining his permission, and obtaining a ruling on his psychotherapist-patient privilege. Since Rice placed his mental condition at issue, he waived his privileges. *State v. Nuss*, 52 Wn. App. 735, 742-43, 763 P.2d 1249 (1988); *State v. Brewton*, 49 Wn. App. 589, 591-92, 744 P.2d 646 (1987). Assuming, without deciding, that the State did not follow the proper procedures in subpoenaing Rice's jail records and in interviewing jail personnel, Rice shows no resulting prejudice.

3. Use of Postarrest Silence. Rice contends that the State improperly used his postarrest silence to show that he was not mentally ill. Rice did not invoke his right to remain silent, however, but voluntarily waived his right and spoke with the police. The State merely pointed out that in Rice's discussions with the police he did not mention the delusional ideas that he later brought up to prove that he was mentally impaired. The State was permitted to make this point. *State v. Belgarde*, 110 Wn.2d 504, 511-12, 755 P.2d 174 (1988).

4. Unanimity on Mitigating Circumstances. Rice next contends that the penalty phase instructions improperly

required the jurors to unanimously agree on the existence of a particular mitigating circumstance. He refers to the instruction that jurors should consult with one another and deliberate with a view to reaching a unanimous verdict. The "verdict" on which the jury was to agree, however, was whether "there are sufficient mitigating circumstances to merit leniency." These instructions could not reasonably have been construed as requiring the jury to unanimously agree on the existence of particular mitigating circumstances *before* weighing them against the aggravating factors.

The two cases on which Rice relies are distinguishable because they involved verdict forms which listed each mitigating factor and required the jury to answer "yes" or "no" as to the existence of each one. *See McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990); *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988). Under those circumstances, the juries could reasonably have believed that they had to answer "no" whenever they did not unanimously agree on the existence of a particular factor, thus improperly precluding consideration of that factor altogether. The instructions involved in Rice's case present no such danger.

5. Limiting Consideration of Favorable Evidence. Rice argues that a preliminary instruction in the penalty phase precluded the jury from considering evidence from the guilt phase, other than that regarding the crimes themselves. He refers to the court's instruction, given before the opening statements, that the jury was to "consider anew all the evidence presented to you in Phase 1 of this case concerning the facts and circumstances surrounding the commission of the crime . . .." Prior to deliberations, however, the court told the jury, without limitation, that it was to consider the "testimony of the witnesses and the exhibits admitted into evidence, in Phase one of this trial and during this special sentencing hearing." Also, it was made clear during counsel's arguments that the jury was to consider all of the evidence presented in the guilt phase, including the

evidence of Rice's mental condition. Therefore, the court did not limit the jury's consideration of the evidence.

█ 6. Requiring More Than One Mitigating Circumstance. Rice next argues that, because the instructions spoke in terms of whether there were sufficient mitigating circumstances, the jury could have understood that a single mitigating circumstance was not enough to merit leniency. Use of the plural form in the instructions did not in itself imply that a single circumstance is insufficient, nor did anyone suggest at trial that a single circumstance is not enough. *See In re Jeffries*, 114 Wn.2d 485, 494-95, 789 P.2d 731 (1990) (rejecting this argument on abuse-of-writ grounds).

█ 7. Prosecution by Indictment. Rice contends that a capital crime must be charged by indictment. This court has previously rejected this argument. *State v. Jeffries*, 105 Wn.2d 398, 423-24, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986). Rice offers no persuasive reason for reexamining this issue.

█ 8. Jury Findings on Mitigating Circumstances. Rice argues that the jury should have been required to enter specific findings regarding the existence of mitigating factors. This court has also rejected this argument. *Jeffries*, 105 Wn.2d at 426-27. Moreover, requiring specific findings on mitigating factors could lead to the problems identified by the Supreme Court in *McKoy v. North Carolina, supra,* and *Mills v. Maryland, supra.*

9. Proportionality Review. Rice finally contends that this court has failed to adopt a "principled methodology" for proportionality reviews. Rice fails to identify the features of a "principled methodology" or how such a methodology would have altered the outcome of this court's proportionality review in *State v. Rice*, 110 Wn.2d 577, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989).

CONCLUSION

Rice has not made a prima facie showing of prejudicial constitutional error as to any of his claims. Accordingly, the

request for a reference hearing is denied and the personal restraint petition is dismissed.

APPENDIX

G. CHRISTIAN HARRIS, M.D., INC., P.S.
*Diplomate, American Board of Psychiatry*
1007 SPRING STREET SEATTLE, WASH. 98104

PHONE (206) 624-6454

June 6, 1986

Robert Lasnik & William Downing
Prosecutors
W.565 King County Courthouse
516 Third Avenue
Seattle, WA 98104

RE: David Rice

Gentlemen:

You have requested an opinion regarding the defendant's claim that he was in a suggestible state of mind at the time of the crimes. Preparatory to this opinion, I interviewed Mr. Rice on three occassions [*sic*] and reviewed the video tape supplied to me by Mr. Savage. Based on these data, I find no evidence pointing towards his being any more or less suggestible than any member of the general population at the time these incidents took place.

You have asked for an opinion regarding the defendant's ability to appreciate the nature of his acts and the moral quality of these acts at the time of the incidents in question. Based on these same data, I believe the defendant was indeed quite able to appreciate the nature of his acts and their moral quality at the time of the events in question.

With more specific regard to the defendant's ability to differentiate right and wrong, he expressed an opinion that his acts were based on mistaken identity. He went on to state that there is still a possibility that he killed the "right people." Despite his feeling that this was a correct thing to do based on his belief that it was his own moral and ethical duty to act in this way, he knew throughout that his actions would be considered wrong by legal authority and that they would be

considered wrong in the minds of most people. He was therefore quite capable of distinguishing right from wrong at the time of the events in question.

I hope this information comprises an adequate response to your questions. It you need additional information please contact me.

Sincerely,

/s/ G. Christian Harris, M.D.

GCH:ct

DORE, C.J., BRACHTENBACH, ANDERSEN, SMITH, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

UTTER, J. (dissenting) —

Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.

*Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The United States Supreme Court's words, written nearly 30 years ago in *Brady v. Maryland, supra*, should provide guidance for us in this case. Our responsibility, to insure the fairness of the administration of justice, is even greater where the ultimate punishment — the death penalty — is to be imposed.

There is no hint in the record that the prosecutor actually knew of exculpatory or mitigating evidence that it failed to provide to Rice's attorneys. The majority, however, erroneously suggests that this is the sole test of whether there is a duty to disclose such evidence. In addition, it places an unrealistic, and unprecedented, burden on Rice to produce evidence that is not reasonably available to him. As a result, the majority does not even reach the merits of Rice's claim that the prosecutor violated his constitutional rights by not disclosing material mitigating evidence. I dissent, and would remand this case for a reference hearing to determine whether the prosecutor knew or should have known of the material mitigating evidence. I also dissent

because the revelation of Dr. Harris's diagnosis demonstrates even more clearly than before that Rice did not have effective assistance of counsel at trial. This requires reversal of Rice's sentence.

## FACTS

The defense employed only one mental health professional, Dr. Kenneth Muscatel, a psychologist, to evaluate Rice. After Dr. Muscatel evaluated Rice, he repeatedly recommended to defense counsel that additional evaluations of Rice be conducted. He told one of Rice's attorneys on at least five separate occasions that at least three psychiatric evaluations of Rice should be conducted to get a reliable diagnosis. Opening Brief of Petitioner, at 13. Defense counsel did not obtain any additional evaluations.

The prosecution, however, did retain a psychiatrist, Dr. G. Christian Harris, to assist in Rice's prosecution. During federal habeas corpus proceedings, Rice's current attorneys learned that Dr. Harris had diagnosed Rice as having paranoid delusional disorder at the time of his original trial. This fact was never revealed to Rice's attorneys at trial. Rice's current attorneys then attempted to discover additional facts from Dr. Harris concerning his diagnosis. Dr. Harris refused to share additional information with them. The State has retained Dr. Harris in the federal court proceedings concerning Rice, and he deemed it inappropriate to discuss the matter with opposing counsel. Based on this new information, Rice's attorneys filed a personal restraint petition with this court, alleging, among other things, that his constitutional rights were violated by the prosecutor's failure to disclose material exculpatory evidence, and that his attorneys did not provide him with effective assistance of counsel by failing to discover Dr. Harris's diagnosis.

## I

The United States Supreme Court has repeatedly stated that due process requires prosecutors to disclose evidence

that is favorable to the accused and material either to guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 674, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985); *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The Court described what evidence is material:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley*, 473 U.S. at 682.

The majority opinion's treatment of the *Brady* issue in this case is flawed for two reasons. First, it suggests that Rice must show that the prosecutor actually knew of Dr. Harris's diagnosis. Second, it places an unprecedented burden on the petitioner, Rice, to produce evidence that is not reasonably available to him.

### A

The majority erroneously suggests that the prosecutors in this case must actually have known of Dr. Harris's diagnosis for there to have been a duty to disclose. Recent federal case law indicates prosecutors need not have actual knowledge of exculpatory or mitigating evidence for a "duty to disclose" to arise.

The Third Circuit recently considered this issue in *United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991). In *Perdomo*, the defendant argued that the prosecution's failure to provide defendant with information regarding the government informant's prior criminal record constituted a violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). *Perdomo*, 929 F.2d at 969. The prosecutor failed to conduct a Virgin Islands criminal history check on the informant. The prosecutor argued that he had no obligation to disclose such information because he did not know of it. The court disagreed:

> It is well accepted that a prosecutor's lack of knowledge does not render information unknown for *Brady* purposes. The

Fifth Circuit has spoken the most often on this issue and has declined to excuse non-disclosure in instances where the prosecution has not sought out information readily available to it. *See United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980). In *Auten*, the appellant argued that his motion for a new trial should have been granted because the prosecution failed to disclose that one of its key witnesses had been convicted more than once. The prosecution argued that it did not withhold or suppress evidence because the information was unknown to it. The prosecutor had chosen not to run an NCIC [National Crime Information Center] check on the witness because of the shortness of time. The court held that the prosecutor's lack of knowledge was not an excuse for a *Brady* violation. "In the interests of inherent fairness," the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it. *Auten*, 632 F.2d at 481 (quoting *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975)). To do otherwise would be "inviting and placing a premium on conduct unworthy of representatives of the United States Government." [*Auten*, at 481.]

*Perdomo*, 929 F.2d at 970. Thus, prosecutors have an obligation to provide all information that is readily available to them. I reemphasize that there is nothing in the record that suggests the prosecution actually knew of Dr. Harris's diagnosis. Although there is no suggestion of bad faith here, the good faith or the bad faith of the prosecutor is irrelevant for the due process inquiry. *Brady*, 373 U.S. at 87.

For purposes of the *Brady* rule, the prosecutor's office and investigators in a case are treated as a "prosecution team". *See United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979). Knowledge by any member of that team is imputed to the prosecutor. *See, e.g., United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391-92 (7th Cir. 1985) (finding that the prosecutor's ignorance of a police worksheet did not justify the State's failure to provide information). I would sum up these legal principles in one test: a prosecutor has an obligation to disclose exculpatory and mitigating evidence that he or she *either knows or should have known about*.

The majority in this case, however, suggests that a duty to disclose information only arises when the prosecutor actually knew of material exculpatory or mitigating evidence. Majority opinion, at 888. The above cited cases indi-

cate, however, that prosecutors have a duty to disclose information that was accessible to them. The prosecutors in this case retained Dr. Harris to evaluate Rice. Dr. Harris's evaluation of Rice was information that could have been readily accessible to the prosecutors.

The State's claim that the prosecutors only asked Harris some very narrow questions does not necessarily obviate their duty under *Brady*. Prosecutors may not structure their investigation in such a way as to remain ignorant of mitigating evidence such as Dr. Harris's diagnosis. *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). Also, if anyone on the "prosecution team" knew of Dr. Harris's diagnosis, then there was a duty to disclose it. *Fairman*, 769 F.2d at 391-92; *Antone*, 603 F.2d at 569.

I am not advocating an onerous duty for prosecutors to expand the scope of their investigations to uncover exculpatory or mitigating evidence for the defendant. *See State v. Judge*, 100 Wn.2d 706, 675 P.2d 219 (1984).[4] Where, however, exculpatory or mitigating evidence is readily accessible, he or she is obliged to provide it to a defendant. This is a fair rule. It takes into account the important due process interests of the defendant. It is not overly onerous for prosecutors. Finally, it discourages any temptation by the State or prosecutors to structure their inquiry or their staffing in such a way as to remain ignorant of material exculpatory or mitigating evidence.[5] We must bear in mind that a criminal trial should be the search for truth, and this purpose is not furthered if the rules of the game turn the trial into a mere "poker game" to be won by the most skilled

---

[4]The majority mischaracterizes the holding in *Judge*. It uses that case to support the proposition that "If the prosecution did not know of the additional diagnosis, it had no duty to disclose it or to inquire further." Majority opinion, at 888. That is not what we said in *Judge*. We simply stated that the prosecution has no duty to extend the scope of an investigation.

[5]Once again, nothing in the record before this court indicates the prosecution in this case deliberately structured its inquiry to avoid learning of Dr. Harris's diagnosis. I am justifying a legal rule, not insinuating wrongdoing on the part of the prosecutors in this case.

tactician. *See Williams v. Florida*, 399 U.S. 78, 82, 26 L. Ed. 2d 446, 90 S. Ct. 1893 (1970).

Therefore, I would remand this case for a reference hearing to determine whether the prosecutor knew or should have known about Dr. Harris's diagnosis.

## B

The majority also places too great a burden on Rice to show facts in support of his allegations, ignoring our previous decisions in this area. We have stated what type of supporting evidence a petitioner must provide in a personal restraint petition:

> The facts upon which the petitioner's claim of unlawful restraint is based and the evidence *reasonably available* to support the factual allegations must be stated.

(Italics mine.) *In re Williams*, 111 Wn.2d 353, 364, 759 P.2d 436 (1988). In *Williams* the petitioner argued that his prior convictions were unconstitutional and should not have been considered in sentencing him for vehicular homicide. His argument was conclusory, and he did not provide the court with supporting affidavits, or a certified transcript of the record or of the docket for any of those earlier cases, all of which were readily available. *Williams*, at 364-65. Therefore, we declined to consider the validity of his claims or remand for a reference hearing. The rule we announced in *Williams* has been consistently followed in subsequent cases. *In re Cook*, 114 Wn.2d 802, 813-14, 792 P.2d 506 (1990); *State v. Gutierrez*, 58 Wn. App. 70, 82, 791 P.2d 275 (1990).

Oddly, the majority neither states nor follows the rule we adopted in *Williams*. If it had, it would have realized that, unlike the petition in the *Williams* case, the petition submitted by Rice's attorneys contains all reasonably available information regarding his claims. They have ably and thoroughly briefed the issue of whether the prosecutor failed to disclose vital mitigating evidence. They have attached numerous supporting affidavits. They have provided the court with facts that make it very plausible

that the prosecutor either knew or should have known of Dr. Harris's diagnosis. The State had retained Dr. Harris at the time of Rice's trial. Now Dr. Harris admits that he diagnosed Rice as having a paranoid delusional disorder at the time of that trial. It seems plausible that Dr. Harris, the State's witness, could have shared this information with the State.

More importantly, direct evidence of whether the prosecution knew or should have known of Dr. Harris's diagnosis is not reasonably available to Rice's attorneys. Other than the prosecutors themselves, only one person is likely to know the answer to this question: Dr. Harris.[6] Dr. Harris, however, refused to discuss the matter further with Rice's attorneys. Rice's attorneys have provided this court with all of the evidence that is reasonably available to support his claims. Only through a reference hearing can the petitioner fully establish whether the prosecution knew or should have known of Dr. Harris's diagnosis. The majority opinion fails to appreciate the fact that the whole purpose of a reference hearing is the discernment of the truth. Instead, it places an unrealistic, unprecedented burden on Rice to produce evidence unavailable to him before he can even get a hearing.

In addition, the unreasonable burden the majority places on a petitioner by requiring him or her to provide us with facts not reasonably available is particularly outrageous in a death penalty case. The United States Supreme Court has repeatedly indicated that heightened scrutiny must be applied in capital cases. *Murray v. Giarratano*, 492 U.S. 1, 8-9, 106 L. Ed. 2d 1, 109 S. Ct. 2765, 2770 (1989); *Beck v. Alabama*, 447 U.S. 625, 637-38, 65 L. Ed. 2d 392, 100 S. Ct. 2382 (1980); *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d

---

[6]The State submitted the declaration of Mr. William L. Downing on this point. Mr. Downing, who has subsequently become a judge for the Superior Court for King County, states that Harris did not provide the prosecution with a diagnosis of Rice, "either orally or in his written report." Affidavit of Downing, at 4. The State has not submitted an affidavit of either Mr. Robert Lasnik, the other prosecutor involved in this case, who also subsequently became a judge for the Superior Court for King County, or Dr. Harris, on this issue.

973, 98 S. Ct. 2954 (1978). The majority, however, fails to even note that we are constitutionally obligated to apply heightened scrutiny in capital cases.

A majority of this court recently stated that "procedural rules are more liberally construed in capital cases." *State v. Lord*, 117 Wn.2d 829, 849, 822 P.2d 177 (1991) (citing *State v. Jeffries*, 105 Wn.2d 398, 418, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986)). Because death is the ultimate punishment, we have properly relaxed procedural rules and attempted to reach the merits of claims submitted by those sentenced to death. There is a substantial chance that Rice's due process rights were violated. Given these high stakes, requiring a reference hearing is appropriate.

## C

If it becomes clear at the reference hearing that the prosecution knew or should have known of Dr. Harris's diagnosis of Rice, his death sentence should be vacated because there is a reasonable probability that the jury would have decided differently had it heard Dr. Harris's diagnosis. Although the majority does not reach this issue when it considers Rice's failure to disclose claim, it does reach it when it considers his ineffective assistance of counsel argument. See majority opinion, at 891-93. In doing so, the majority glosses over important differences between Dr. Harris's testimony and that of Dr. Muscatel. In addition, it does not recognize that the unavailability of Dr. Harris's testimony made Rice unable to rebut evidence and argument used against him. Finally, it fails to appreciate that the jury would likely have given Dr. Harris's testimony great weight because the State, not defense counsel, retained Dr. Harris to perform an evaluation of Rice.

First, a diagnosis of Rice as having a paranoid delusional disorder would have explained Rice's apparent normality when he was arrested. The symptoms of that disorder are not readily noticeable. "Apart from the delusion or its ramifications, behavior is not obviously odd or bizarre." American Psychiatric Ass'n, *Diagnostic and Statistical*

*Manual of Mental Disorders* 199 (3d rev. ed. 1987) (here-inafter *DSM-III-R*). The manual reiterates this point:

> Impairment in daily functioning is rare. Intellectual and occupational functioning are usually satisfactory, even when the disorder is chronic. Social and marital functioning, on the other hand, are often impaired. A common characteristic of people with Delusional Disorder is the apparent normality of their behavior and appearance when their delusional ideas are not being discussed or acted upon.

*DSM-III-R*, at 200-01. Thus, apparent normality is one of the features of the disorder. Throughout the trial, the prosecutor both presented testimony and argued forcefully that Rice appeared normal when arrested. The State's theory was that Rice later fabricated his mental abnormality.[7] If Rice's attorneys had evidence of Dr. Harris's diagnosis, they could have explained this apparent contradiction. They could have shown that Rice's apparent normality at the time of his arrest was a central feature of his paranoid delusional disorder.

Dr. Muscatel, however, diagnosed Rice as having a schizotypal personality disorder. Report of Proceedings, at 1805: 21. Dr. Muscatel did not testify that people with schizotypal personality disorder often appear normal. Apparent normality is not a common diagnostic feature of that disorder. *DSM-III-R*, at 340-42. There is a significant difference between a schizotypal personality disorder and a paranoid delusional disorder. Therefore, I disagree with the

---

[7]For example, the State called Mr. Michael Morrison, a psychiatric evaluation specialist at the King County Jail, to testify during the guilt phase of the trial. Morrison testified he conducted a psychiatric evaluation of Rice on December 28, 1985, to determine whether he was fit to be placed in the general jail population. The prosecutor asked Morrison about his impressions of Rice at that time. Morrison stated that he was "surprised [Rice] didn't appear to have any psychiatric disorder." Report of Proceedings, at 1927: 19-20. He also stated that Rice "gave the impression of being a typical ordinary jail inmate without a psychiatric disorder." Report of Proceedings, at 1928: 3-4.

At the end of the guilt phase, the prosecutor argued that Morrison's impression that Rice was a typical prisoner without any disorder deserved great weight because his interview with Rice was close in time to the crimes. Report of Proceedings, at 2014-15. Then the State concluded with an appeal to the jury not to be fooled by Rice's fabricated claim of mental irresponsibility. Report of Proceedings, at 2051-52.

majority's hasty conclusion that Dr. Harris's testimony would have "covered the same points" as that of Dr. Muscatel.

Second, the majority ignores the fact that the unavailability of Dr. Harris's testimony made Rice unable to rebut evidence and argument used against him by the State. The State in this case repeatedly emphasized the apparent normality of Rice during the period shortly after the police apprehended him. The United States Supreme Court has stated that a capital defendant may not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362, 51 L. Ed. 2d 393, 97 S. Ct. 1197, 1207 (1977); *see also Skipper v. South Carolina*, 476 U.S. 1, 5 n.1, 90 L. Ed. 2d 1, 106 S. Ct. 1669, 1671 (1986); *Chaney v. Brown*, 730 F.2d 1334, 1352 (10th Cir.) (finding that jury's determination on the death penalty might have been affected where prosecutor withheld information that could have been used to rebut State's argument), *cert. denied*, 469 U.S. 1090 (1984). Therefore, Rice should have had the opportunity to rebut the State's charge that his mental problems were fabrications and rationalizations.

Finally, the majority ignores the crucial fact that Dr. Harris, unlike Dr. Muscatel, was hired by the State. The United States Supreme Court has recognized the enhanced value of neutral, disinterested witnesses. In *Skipper v. South Carolina*, 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986), the Court held that exclusion from the sentencing hearing of testimony of jailers regarding the petitioner's good behavior during the 7 months he spent in jail awaiting trial deprived him of his right to present relevant mitigating evidence. The State argued that such testimony was merely cumulative, because the petitioner and his wife had already testified about his behavior in jail awaiting trial. The Court, however, rejected the State's harmless error argument. The Court wrote:

> The testimony of more disinterested witnesses — and, in particular, of jailers who would have had no particular reason to

be favorably predisposed toward one of their charges — would quite naturally be given much greater weight by the jury.

*Skipper*, 476 U.S. at 8. Similarly, the testimony of Dr. Harris would have likely had a greater impact on the jury because the State had retained him.

In this, a death penalty case, I find the unavailability of Dr. Harris's diagnosis was "sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). Therefore, if it became apparent at the reference hearing that the prosecutor knew or should have known of Dr. Harris's diagnosis of Rice, his sentence must be vacated.[8]

## II

We should also vacate Mr. Rice's sentence because his attorneys did not provide him with effective assistance of counsel. The majority correctly states the 2-part test for an ineffective assistance of counsel claim. To prevail on such a claim, the defendant must show (1) ineffective representation and (2) resulting prejudice.

I have already shown that the second part of this test, prejudice, has been met. As demonstrated in part I, section C of my opinion, Dr. Harris's testimony would have been material at the sentencing stage of Rice's trial. The test for materiality in a failure to disclose claim and the test for prejudice in an ineffective assistance of counsel claim are the same: a reasonable probability that the outcome would have been different. *See Bagley*, 473 U.S. at 682; *Strickland v. Washington*, 466 U.S. 668, 694, 80 L. Ed. 2d 674, 104 S.

---

[8]It is noteworthy that a majority of this court in *State v. Pawlyk*, 115 Wn.2d 457, 800 P.2d 338 (1990) allowed prosecutors to compel discovery of the findings and conclusions of defense-retained psychiatrists and call them as witnesses. In doing so, the majority emphasized the reciprocal nature of criminal discovery, and the search for truth. It also stated:

> Moreover, there is no question but that if a State selected psychiatrist examined defendant and found him insane, the defendant would be entitled to this information as a matter of due process.

(Citation omitted.) *Pawlyk*, 115 Wn.2d at 475. The majority's approach in this case would unduly strengthen the State's position and make this reciprocity a sham.

Ct. 2052, 2068 (1984). Therefore, the unavailability of Dr. Harris's testimony was prejudicial. All that needs to be considered is the first prong of the *Strickland* test: whether Rice received ineffective representation.

Ineffective representation occurs where counsel's conduct falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. We must judge the reasonableness of counsel's challenged conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Failure to engage in reasonable investigation often results in ineffective assistance of counsel. *See, e.g., Henderson v. Sargent*, 926 F.2d 706 (8th Cir.) (counsel ineffective by failing to investigate possibility of other perpetrators of crime), *amended on rehearing*, 939 F.2d 586 (1991), *cert. denied*, 112 S. Ct. 915 (1992); *Chambers v. Armontrout*, 907 F.2d 825 (8th Cir. 1990) (counsel ineffective by failing to interview or call self-defense witness); *Futch v. Dugger*, 874 F.2d 1483, 1486 (11th Cir. 1989); *Code v. Montgomery*, 799 F.2d 1481 (11th Cir. 1986) (counsel ineffective by failing to investigate alibi witness).

Considering the circumstances of this case, Rice's attorneys' failure to investigate Dr. Harris's evaluation of Rice amounted to ineffective assistance of counsel. Investigation is not a decision intimately tied to trial strategy. Instead, defense counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Chambers*, 907 F.2d at 828. The majority fails to mention that Dr. Muscatel repeatedly advised defense counsel to obtain additional psychiatric evaluations of Rice. They failed to do so. If his attorneys had followed Dr. Muscatel's advice and obtained additional evaluations of Rice through their own experts, it probably would have made further investigation into Dr. Harris's evaluation unnecessary. Given the fact that defense counsel did not obtain additional psychological evaluations, the least they could have done was inquire further when they learned that Dr. Harris

had also examined Rice.[9] In other words, Rice's trial attorneys did not "make a reasonable decision that [made further investigation] unnecessary." *Strickland*, 466 U.S. at 691. Therefore, defense counsel provided ineffective representation by not inquiring further into Dr. Harris's evaluation.

The recent revelation of Dr. Harris's diagnosis of Rice as suffering from paranoid delusional disorder also supports the conclusion that Rice's attorneys provided ineffective assistance of counsel by not obtaining additional psychiatric evaluations of Rice. As previously noted, Dr. Muscatel repeatedly recommended that additional evaluations of Rice be performed, but none were. In an order dismissing Rice's first personal restraint petition, a majority of this court wrote:

> Also, any claim that defense counsel was ineffective in failing to find another expert presupposes that counsel would have been able to find a supportive expert had he looked for one. Rice has made no such showing.

Order Dismissing Personal Restraint Petition, cause 54575-8, at 8. Now we have new evidence demonstrating how valuable additional evaluations of Rice would likely have been.[10]

---

[9]The majority argues that it was reasonable for defense attorneys not to investigate Dr. Harris's evaluation because it was clear that he would be "hostile to their case." I am not persuaded. Because *the State* had hired Dr. Harris to assist in the prosecution, any testimony from Dr. Harris suggesting that Rice was mentally disturbed at the time he committed the crimes would have been very helpful for the defense. The majority also relies heavily on a letter sent by Dr. Harris to the prosecution and shared with the defense. The substance of the letter should not have deterred Rice's attorneys from inquiring further. The letter that Dr. Harris sent the State only answered a few narrow questions. It did not reveal Dr. Harris's more general evaluation of Rice. In addition, failure to investigate Dr. Harris's evaluation further may have constituted ineffective assistance of counsel even though his testimony ultimately may have contained some matters negative to Rice's case. *See Chambers*, 907 F.2d at 829-30.

[10]In addition to Dr. Harris's conclusion that Rice suffers from paranoid delusional disorder, two other psychiatrists, Jay Hugh Ehly, M.D., and Frederick Davis, M.D., have reached the same conclusion during the federal habeas corpus proceedings.

Rice has demonstrated ineffective assistance of counsel. Defense counsel's failure to inquire further as to Dr. Harris's conclusions, as well as its failure to obtain any additional evaluations of Rice, amounted to ineffective assistance of counsel. I would vacate his sentence.

### III

There is no need to respond to the balance of the majority opinion. See majority opinion, at 893-96. It is pure dicta and is not binding authority for us in future cases.

I would require a reference hearing to determine whether the prosecution knew or should have known of Dr. Harris's diagnosis. If the hearing reveals that the prosecution knew or should have known of that diagnosis, Rice's sentence should be vacated. In the alternative, I would vacate Rice's sentence because he had ineffective assistance of counsel at trial.