[No. 33644-8-II.   Division Two.   December 26, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHELLE L. KNOTEK, *Appellant*.

*Gregory C. Link* (of *Washington Appellate Project*), for appellant.

*David J. Burke, Prosecuting Attorney,* for respondent.

¶1 HUNT, J. — Michelle Knotek appeals her guilty plea convictions for second degree murder and first degree manslaughter; she also appeals the trial court's denial of her postjudgment and sentence motion to withdraw her guilty plea. Knotek argues that she did not enter into her *Alford*[1] plea knowingly, intelligently, and voluntarily because she was misinformed about (1) the maximum sen-

---

[1] *North Carolina v. Alford,* 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

tences that could be imposed and (2) the term of community placement. In her statement of additional grounds[2] (SAG), Knotek further contends that (1) her attorney coerced her into entering into the plea agreement, (2) her attorney provided ineffective assistance, (3) she was not competent at the time she entered her guilty plea, (4) the crimes to which she pleaded guilty "didn't fit" the facts of this case, and (5) the trial court committed judicial misconduct.[3] Holding that the record shows that Knotek entered her guilty plea knowingly, intelligently, and voluntarily, we affirm.

## FACTS

### I. MURDERS

#### A. Count I—Kathy Loreno

¶2 In 1991, Michelle Knotek invited Kathy Loreno to live with her family in South Bend, Pacific County. Loreno was to help care for Knotek's two teenage daughters and a third daughter expected to be born soon. Loreno accepted the offer. Loreno was in good health when she began living with the Knoteks. Initially the Knotek family treated Loreno well.

¶3 But soon, Knotek and her husband, David Knotek,[4] began abusing Loreno physically and mentally; they continued this abuse through 1991. Knotek and her husband (1) hit and slapped Loreno, including numerous blows to the

---

[2] RAP 10.10.

[3] In her SAG, Knotek also asserts the following: (1) she received unsatisfactory treatment in jail; (2) she was denied her right to prompt mental health care; (3) the State engaged in prosecutorial misconduct; (4) she was denied her right to medical treatment; (5) both law enforcement and her attorney could not find, or lost, an allegedly exculpatory letter, the contents of which she does not reveal; and (6) law enforcement mishandled her personal effects. These claims are unsubstantiated, not recognizable on direct appeal of a criminal conviction (in contrast with collateral attack in a personal restraint petition under RAP 16), or not ripe for review; thus, we do not address them.

[4] For clarity, we will refer to Michelle Knotek as "Knotek" and to David Knotek as either "David" or "Knotek's husband."

head; (2) dragged her across the ground; (3) pulled her hair; (4) poisoned her; (5) forced her to submit to bizarre "treatments," such as bleach and salt to clean her wounds, and ingesting salt and prescription medications; (6) forced her to live and to work outdoors in harsh weather conditions while minimally clothed or naked until she became hypothermic; (7) starved her; and (8) as punishment, forced her to immerse herself in cold water or mud. As a result of this abuse, Loreno lost 100 pounds, her hair and teeth fell out, and she declined physically and mentally. Near the end of her life, Loreno could not walk or talk, one side of her face drooped, her vision had declined significantly, and she was covered in vomit.

¶4 Eventually Loreno died as a result of this prolonged abuse. Acting on Knotek's decision, David and Shane Watson, David's nephew, burned and buried Loreno's body in the Knoteks' backyard. Knotek concocted a story about Loreno having run away with her boyfriend, repeatedly quizzed her (Knotek's) children about the story, and generated letters to Loreno's family purporting to be from Loreno so her family would believe she was still alive.

### B. Count II—Ron Woodworth

¶5 In October 2001, Knotek invited Ron Woodworth to live in the Knotek home. Knotek's youngest daughter witnessed Knotek and her husband inflict physical and emotional abuse on Woodworth, virtually identical to the acts of abuse they had committed against Loreno 10 years earlier. Like Loreno, Woodworth declined physically and mentally and eventually died as a result of the abuse sometime between the end of 2001 and August 2003. David buried Woodworth's body in the backyard of the Knotek residence.

### C. Arrest

¶6 In August 2003, Knotek's two older daughters contacted the police about Knotek's abuse of Woodworth.

Knotek's youngest daughter also provided a statement. The police arrested Knotek and David.

## II. PROCEDURE

¶7 The State charged Michelle Knotek[5] with two counts of second degree murder: count I, for the 1991 death of Kathy Loreno; and count II, for the 2003 death of Ron Woodworth. The trial court denied Knotek's motion to sever counts because the State planned to use David as a witness against Knotek.

### A. *Alford* Plea

¶8 On June 18, 2004, Knotek appeared in Pacific County Superior Court to plead guilty to second degree murder and first degree manslaughter. The State agreed to reduce count II from second degree murder to first degree manslaughter and to recommend sentences at the low end of the standard range for both counts. The parties stipulated that the facts contained in the August 11, 2003 probable cause affidavit, the bill of particulars, and the State's brief in opposition to Knotek's motion to sever were sufficient to find Knotek guilty beyond a reasonable doubt on these two charges.

¶9 The trial court engaged in a thorough inquiry to ensure that Knotek was entering her plea knowingly, intelligently, and voluntarily. Knotek indicated that (1) she had completed 14 years of school and could read and write "very well"; (2) she had discussed "everything set forth in the Plea Agreement" with her counsel over the course of a "few hours," and they had "talk[ed] about it throughout the last few weeks," Report of Proceedings (RP) (June 18, 2004) at 6-7; (3) she understood the standard sentencing range for second degree murder was 123 to 164 months, with a maximum term of life in prison, RP (June 18, 2004) at 7; (4) she knew the standard sentencing range for first degree

---

[5] David separately pleaded guilty to murder in the second degree, unlawful disposal of human remains, and rendering criminal assistance in the first degree. His case is not part of this appeal.

manslaughter was 78 to 102 months, with a maximum term of life in prison; (5) because these were serious violent offenses, she understood the sentences for each count would run consecutively, which she confirmed meant she would first serve one sentence and then serve the other sentence after completing the first one; (6) she understood that the State would recommend sentences of 123 months on count I and 78 months on count II, for a total of 201 months; (7) she understood that the court need not follow the State's sentencing recommendation; (8) she also understood that she faced the possibility of an "exceptional sentence" on each count, meaning sentences above the standard range; (9) she understood that the plea bargain also called for her to serve 24 months of community custody; (10) she was entering an *Alford* plea, which she understood was a plea of guilty; and (11) she understood the financial penalties that could result from her plea, including restitution.

¶10 The trial court asked Knotek five different times whether she was entering her plea voluntarily; in each instance, Knotek answered in the affirmative. The trial court also (1) made sure that Knotek had gone over her statement of defendant on plea of guilty with counsel and that she understood the provisions of the statement; (2) explained to Knotek each of the rights she was waiving by entering her guilty plea; and (3) explained to Knotek that her crimes would constitute "one strike" for future charging and sentencing purposes, which Knotek confirmed she understood. The court then asked Knotek how she would plead on each charge, and Knotek replied, "Guilty."

¶11 Based on the parties' stipulation and Knotek's *Alford* pleas, the trial court found Knotek guilty of count I, second degree murder, and count II, first degree manslaughter.

## B. Sentencing

¶12 At Knotek's August 19, 2004 sentencing, the parties and the trial court addressed a recent relevant United

States Supreme Court decision, *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), rendered on June 24, 2004, less than a week *after* Knotek's June 18, 2004 guilty plea.

¶13 The State acknowledged that (1) as a result of the *Blakely* decision, "the Court's hands are bound by the standard range" and (2) during "quite a few conversations" with Knotek, defense counsel, and the trial court, had explained the *Blakely* decision and how the decision would affect her sentence.

¶14 Knotek's counsel acknowledged that (1) Knotek's "decision to enter such a plea was also reflective of the threat of an exceptional sentence recommendation . . . " and (2) the "threat certainly is not as strong in light of the current *Blakely* decision as it was at the time the plea was entered." App. C to Resp't's Br., Suppl. Sentencing Mem. at 6. Knotek proceeded to sentencing, fully aware of the reduced sentence that she now faced because of *Blakely.* Knotek did not claim that she had been misinformed about the consequences of her plea. Nor did she move to vacate or to withdraw her plea. Instead, the colloquy focused on her good luck—that the *Blakely* decision had eliminated the possibility of the more severe exceptional sentence to which she had been previously exposed.

¶15 Just before pronouncing sentence, the trial court reminded Knotek that, but for the *Blakely* decision, it would have imposed a sentence above the standard range:

> I also know, finally, that [Knotek] should be very thankful to the U.S. Supreme Court and the 5-4 decision in *Blakely v. Washington* because this would not be the sentence that I would hand down but for that decision.

RP (Aug. 19, 2004) at 34. The court then sentenced Knotek to the top end of the standard range on each conviction, 164 months on count I and 102 months on count II, to run consecutively, for a total of 266 months confinement. Knotek did not raise any question about the voluntariness of her *Alford* plea in connection with her sentencing.

## C. Postjudgment Motion To Withdraw Guilty Plea

¶16 Eight months later, in April 2005, Knotek moved pro se to withdraw her *Alford* plea. She alleged that she had not been correctly informed, that generally she did not understand the consequences of her plea when she entered it the previous year, and that she had been denied effective assistance of counsel. The trial court denied the motion.

### III. APPEAL

¶17 Knotek appeals both the trial court's denial of her motion to withdraw her guilty plea and the guilty plea conviction and judgment and sentence.[6]

### ANALYSIS

#### I. VOLUNTARY, KNOWING, AND INTELLIGENT PLEA

¶18 Knotek argues that she did not enter her *Alford* plea knowingly, intelligently, or voluntarily because she did not understand the direct consequences of her plea. She contends she was misinformed about (1) the maximum sentence that could be imposed for the charged offenses and (2) the proper term of community placement. These arguments fail.

#### A. Issue Raised for First Time on Appeal

¶19 Generally, a defendant waives any issues he did not raise in the trial court. RAP 2.5; *State v. Smith*, 155 Wn.2d 496, 501, 120 P.3d 559 (2005). Nonetheless, a defendant can raise for the first time on appeal alleged manifest errors significantly affecting constitutional rights. RAP 2.5(a)(3); *State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1988). Alleged involuntariness of a guilty plea is the type of constitutional error that a defendant can raise for

---

[6] We granted Knotek's motion to file a late notice of appeal from her guilty plea, judgment, and sentence.

the first time on appeal. *See State v. Walsh*, 143 Wn.2d 1, 6, 17 P.3d 591 (2001). "[W]hen an adequate record exists, the appellate court may carry out its long-standing duty to assure constitutionally adequate trials by engaging in review of manifest constitutional errors raised for the first time on appeal." *State v. Contreras*, 92 Wn. App. 307, 313, 966 P.2d 915 (1998).

### B. Standard of Review

¶20 "The State bears the burden of proving the validity of a guilty plea," including the defendant's "[k]nowledge of the direct consequences" of the plea, which the State may prove from the record or by clear and convincing extrinsic evidence. *State v. Ross*, 129 Wn.2d 279, 287, 916 P.2d 405 (1996). A defendant, in contrast, bears the burden of proving "manifest injustice," defined as " 'an injustice that is obvious, directly observable, overt, not obscure.' " *State v. Saas*, 118 Wn.2d 37, 42, 820 P.2d 505 (1991) (quoting *State v. Taylor*, 83 Wn.2d 594, 596, 521 P.2d 699 (1974)).

### C. Direct Consequences of Plea

¶21 Due process requires an affirmative showing that a defendant entered a guilty plea intelligently and voluntarily. *State v. Barton*, 93 Wn.2d 301, 304, 609 P.2d 1353 (1980) (citing *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969)). A defendant need not be informed of all possible consequences of a plea, but rather, only the direct consequences. *Ross*, 129 Wn.2d at 284. The maximum sentence and term of mandatory community placement are among such direct consequences of a plea. *State v. Morley*, 134 Wn.2d 588, 621, 952 P.2d 167 (1998); *Ross*, 129 Wn.2d at 284-87. If based on misinformation about sentencing consequences, a guilty plea is not entered knowingly. *State v. Miller*, 110 Wn.2d 528, 531, 756 P.2d 122 (1988).

¶22 Beyond this constitutional minimum, Criminal Rule (CrR) 4.2 provides further safeguards for guilty pleas:

> "The court shall not accept a plea of guilty, without first determining that it is made voluntarily, competently and with an understanding of the nature of the charge and the consequences of the plea. The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea."

*Ross*, 129 Wn.2d at 284 (quoting CrR 4.2(d)); *see also* RCW 9.94A.431.

¶23 CrR 7.8 governs postjudgment motions to withdraw a guilty plea. This rule allows the trial court to relieve a party from a final judgment if the judgment is void or for any other reason justifying relief from operation of the judgment. CrR 7.8(b)(4)-(5).[7]

### 1. Direct Maximum Sentence

¶24 Knotek contends that she was misinformed about the maximum terms of confinement for the homicide charges to which she pleaded guilty when the trial court told her that she faced the possibility of an exceptional sentence above the standard sentencing range, up to life in prison, for each conviction. She argues that because *"Blakely v. Washington* rejected the notion that this life term under RCW 9A.20.021(1)(a) was the statutory maximum for a Class A offense," the correct maximum terms were 164 months for second degree murder and 102 months for manslaughter.[8] Br. of Appellant at 7.

---

[7] *See* CrR 4.2(f), which governs prejudgment motions to withdraw guilty pleas and references CrR 7.8 for postjudgment motions.

[8] The State argues that, even applying post-*Blakely* standards, the trial court's instruction that Knotek faced maximum life sentences for both counts was correct because Knotek potentially faced "theoretical maximum" life sentences if (1) she went to trial, (2) the State submitted aggravating factors to the jury, and (3) the jury found her guilty of a class A felony. This argument fails to address that it is the direct consequences of her *guilty plea*, not the maximum potential sentence if she went to trial, that Knotek had to understand. *Ross*, 129 Wn.2d at 284.

■ ¶25 Contrary to Knotek's assertion, *Blakely*, 542 U.S. 296,[9] does not nullify life imprisonment as the statutory maximum for a class A offense. Rather, *Blakely* outlined the procedure by which a life term for a class A offense may be imposed in the state of Washington: A life sentence is possible for a class A felony only if the trier of fact specifically finds beyond a reasonable doubt, or the defendant admits to, aggravating facts supporting an exceptional life sentence. Otherwise, the effective maximum for a class A felony is the top end of the standard sentencing range, which here is 164 months for second degree murder and 102 months for first degree manslaughter. RCW 9.94A.510.

■ ¶26 Under her pre-*Blakely* plea agreement with the State, Knotek stipulated only to facts supporting convictions for second degree murder and first degree manslaughter. She did not stipulate to additional facts that could have supported an exceptional sentence; nor was there a jury finding of these additional facts, as *Blakely* required shortly after Knotek entered her plea. Filed between Knotek's guilty plea and her sentencing, *Blakely* eliminated the possibility of exceptional life sentences that the trial court had discussed with her before accepting her plea. *Blakely* thereby reduced the maximum terms of confinement to which the court could sentence Knotek post-*Blakely* as a result of her pre-*Blakely* plea—the top end of the standard ranges—164 months for second degree murder and 102 months for first degree manslaughter. RCW 9.94A.510.

¶27 The record clearly shows that, regardless of Knotek's currently claimed understanding of the sentencing consequences when she entered her pre-*Blakely* plea,

---

[9] *Blakely* clarified the United States Supreme Court's earlier opinion in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), which held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed *statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added). The court in *Blakely* explained that *statutory maximum* referenced in *Apprendi* "is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely*, 542 U.S. at 303.

before the trial court sentenced her post-*Blakely*, she clearly understood that *Blakely* had eliminated the possibility of exceptional life sentences and, thus, had substantially lowered the maximum sentences that the trial court could impose. Armed with this knowledge, Knotek chose to proceed to sentencing in order to take advantage of this windfall sentence reduction, knowing that if she withdrew her plea and went to trial, she would face the possibility of two life sentences.

¶28 Where a defendant enters a plea agreement under the erroneous belief that her standard ranges are higher than they are in fact, she is not entitled to withdraw her plea under a claim that it was invalidly entered. *In re Pers. Restraint of Matthews*, 128 Wn. App. 267, 273, 115 P.3d 1043 (2005). *See also State v. Mendoza*, 157 Wn.2d 582, 592, 141 P.3d 49 (2006) (where defendant is aware of an offender score miscalculation before sentencing but does not object, she waives any challenge to the voluntariness of her guilty plea on appeal).

¶29 Moreover, Knotek never claimed to have been misled about the consequences of her plea nor sought to withdraw her plea before, or even immediately after, sentencing. Instead, she waited for eight months before filing her motion to withdraw.

### 2. Mandatory community custody and placement

¶30 Knotek also argues that her *Alford* plea was involuntary because she was misinformed about the proper term of mandatory community placement and community custody.

### a. Community custody

¶31 Knotek first contends that (1) paragraph 6(a) of her statement of defendant on plea of guilty (Statement) indicated that she faced a "community custody range" of 24 months for her second degree murder conviction; (2) but

there was no such "community custody range" because this murder was committed in 1991, before enactment of RCW 9.94A.715, which implemented community custody; and (3) paragraph 6(f) of her Statement specified that she faced "community placement" of 24 months or a period equal to any earned early release time.[10] This argument fails.

¶32 Knotek's Statement properly informed her of the mandatory periods of community placement for her second degree murder conviction, count I, committed in 1991. Paragraph 6(a), as it relates to count I, refers to "community placement," not "community custody."[11] Paragraph 6(f) expressly acknowledges: "In addition to sentencing me to confinement, the judge will sentence me to serve 24 months of community placement or up to the period of earned early release, whichever is longer." Thus, Knotek's Statement shows that she received accurate information about the community placement consequences of her plea of guilty to the 1991 murder of Loreno.

### b. Consecutive terms of community placement and custody

¶33 Second, Knotek argues that, although her guilty plea statement indicates she will serve her terms of confinement consecutively, it does not state whether she would similarly serve her terms of community placement for count I and the range of community custody for count II consecutively. This argument also fails.

¶34 Immediately underneath recitation of the standard sentencing ranges, maximum sentence, and community placement and custody terms for her two convictions, paragraph 6(a) of Knotek's guilty plea statement says that her *sentences* [are] to run consecutively." A "sentence" is

---

[10] Knotek's statement of defendant on plea of guilty. Clerk's Papers (CP) at 245-51.

[11] The relevant table, titled "community custody range," specifically instructs the reader that it is "[o]nly applicable for crimes committed on or after July 1, 2000" and "[f]or crimes committed prior to July 1, 2000, see paragraph 6(f)." CP at 246-47.

"[t]he judgment that a court formally pronounces after finding a criminal defendant guilty; the punishment imposed on a criminal wrongdoer." BLACK'S LAW DICTIONARY 1393 (8th ed. 2004). In the context of a guilty plea, community placement is deemed part of a defendant's punishment. *Ross*, 129 Wn.2d at 285. Therefore, the term "sentences" in Knotek's Statement necessarily included her terms of confinement and her mandatory periods of community placement and custody.

## D. Additional SAG Arguments

¶35 In her SAG, Knotek argues that she did not knowingly or voluntarily enter her *Alford* plea because (1) her attorney coerced her to accept the plea agreement, (2) she was not competent at the time she entered her plea, and (3) the crimes to which she pleaded guilty "didn't fit" the facts. These arguments also fail.

### 1. Voluntariness

¶36 The record shows that Knotek entered her *Alford* plea voluntarily. The trial court asked five different times whether anyone had coerced her to enter into the plea agreement, and each time Knotek indicated that she was entering her plea voluntarily. And nothing in the record indicates that Knotek's attorney manipulated her into entering the plea by failing to inform her that an *Alford* plea is not a guilty plea.

¶37 On the contrary, the record shows that the trial court specifically asked Knotek, "[D]o you understand that an *Alford* plea is a guilty plea and you'll give up these rights by making an *Alford* plea." To which Knotek replied, "Yes." RP (June 18, 2004) at 18. Consistent with this response, when the trial court asked Knotek how she was pleading to each charge, Knotek replied, "Guilty," both times. RP (June 18, 2004) at 20-21; *see State v. Perez*, 33 Wn. App. 258, 262, 654 P.2d 708 (1982) ("When the judge goes on to inquire orally of the defendant and satisfies himself on the record of

the existence of the various criteria of voluntariness, the presumption of voluntariness is well nigh irrefutable.").

## 2. Competency

¶38 The record also shows that Knotek was competent to enter her plea of guilt. In *Godinez v. Moran*, 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993), the United States Supreme Court held that the level of competency required to stand trial and plead guilty are the same—a " 'sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding' " and " 'a rational as well as factual understanding of the proceedings against [her].' " *Godinez*, 509 U.S. at 396, 400-01 (quoting *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). At the time of her plea, Knotek's responses to the trial court's thorough questioning demonstrated that (1) she had communicated extensively with her attorney regarding the plea proceeding and (2) she had a firm grasp of the events that took place at the proceeding. Furthermore, there is nothing in the record showing that Knotek lacked competency.

## 3. Factual basis

¶39 The record shows that the facts sufficiently support the crimes to which Knotek pleaded guilty, including the intent element of second degree murder. SAG at 29.

¶40 CrR 4.2(d) requires the trial court to determine whether there is a factual basis for the plea. A factual basis for a plea of guilty exists if there is sufficient evidence for a jury to conclude that the defendant is guilty. The trial court need not be convinced of the defendant's guilt beyond a reasonable doubt. *In re Pers. Restraint of Ness*, 70 Wn. App. 817, 824, 855 P.2d 1191 (1993).

¶41 When a defendant enters an *Alford* plea, the trial court must exercise extreme care to ensure that the plea satisfies constitutional requirements. An *Alford*

plea is valid if the record before the trial court contains strong evidence of actual guilt. *Ness*, 70 Wn. App at 824. Such is the case here.

¶42 Knotek and the State stipulated that the facts contained in the State's August 11, 2003 probable cause affidavit, the bill of particulars, and the State's brief in opposition to Knotek's motion to sever counts were sufficient for a finder of fact to find her guilty of the two homicide charges beyond a reasonable doubt. *Ness*, 70 Wn. App. at 824 (the prosecutor's factual statement is a source the court may consider at a plea hearing to determine whether the plea is supported by sufficient evidence). These facts were sufficient for a jury, or the court sitting without a jury, to conclude that Knotek had the "intent to cause the death of another person," as required for second degree murder.[12] *State v. Caliguri*, 99 Wn.2d 501, 503 n.1, 664 P.2d 466 (1983) (intent to kill may be inferred from circumstantial evidence); RCW 9A.32.050.

¶43 We hold that (1) the record shows Knotek entered her plea knowingly, intelligently, and voluntarily; (2) *Blakely*'s effect in lowering her maximum sentences did not affect the voluntariness of her plea; and (3) even if it did, Knotek waived her ability to raise this issue when she proceeded to sentencing fully intending to take advantage of this *Blakely* windfall without then challenging the voluntariness of her plea or the correctness of the sentencing information on which her plea was based. Knotek having failed to show that her judgment and sentence were void or any other reason warranting relief from operation of the judgment, we uphold the trial court's denial of her motion to withdraw her *Alford* plea. CrR 7.8(b)(4)-(5).

---

[12] These facts include that Knotek committed particularly egregious forms of mental and emotional abuse against the victims. More specifically, Knotek pulled the victim around by her hair, frequently delivered blows to the head, forced the victim to ingest medication, forced victim to ingest salt and rotten foods, would "waterboard" the victim, forced the victim to stay outside with little or no shelter, and would force the victim to work outdoors in extreme weather conditions either naked or minimally clothed.

## II. Effective Assistance of Counsel

¶44 Knotek next contends that she received ineffective assistance from her two attorneys because they did not (1) accurately articulate her concerns at sentencing, (2) accurately explain that an *Alford* plea is a plea of guilt, and (3) explain that the trial court does not have to follow the State's sentencing recommendation after she enters her plea. These arguments also fail.

### A. Standard of Review

¶45 Review of an ineffective assistance claim begins with a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 487, 965 P.2d 593 (1998) (citing *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To prevail on this claim, Knotek must show (1) her attorneys' representation fell below an objective standard of reasonableness and (2) their errors were so serious as to deprive the defendant of a fair trial. *Strickland*, 466 U.S. at 687; *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 888-89, 828 P.2d 1086 (1992). The latter element is met by showing that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceeding would have been different. *Rice*, 118 Wn.2d at 889. In a plea bargaining context, "effective assistance of counsel" merely requires that counsel "actually and substantially assist[ ] his client in deciding whether to plead guilty." *State v. Cameron*, 30 Wn. App. 229, 232, 633 P.2d 901 (1981). Knotek fails to meet these criteria.

### B. Trial Counsel's Performance

¶46 First, contrary to Knotek's contention, before Knotek entered her plea, counsel informed the trial court that they had gone over the nature of an *Alford* plea with her so that she understood the concept. RP (June 18, 2004) at 4-5. When

the trial court asked Knotek directly if she understood that "an *Alford* plea is a guilty plea and you'll give up [her relevant constitutional rights] by making an *Alford* plea," RP (June 18, 2004) at 18, Knotek replied, "Yes." RP (June 18, 2004) at 18. Additionally, before entering her plea, Knotek stated on the record that she understood that the sentencing court need not follow the State's sentencing recommendation.

¶47 Second, by arranging for Knotek to enter an *Alford* plea, counsel allowed her to maintain her innocence[13] while simultaneously providing her an opportunity to plead guilty to reduced charges with a low-end standard sentencing range recommended by the State on both counts.

¶48 Third, Knotek's counsel adequately addressed her concerns at sentencing. Even though Knotek took responsibility for the victims' deaths by abuse, counsel specifically told the court that Knotek had entered an *Alford* plea because, although she took responsibility for the abuse that occurred in her home, she still maintained she did not kill either of the victims.

¶49 Knotek has not shown that her trial counsel failed or prejudiced her in any way. Therefore, her ineffective assistance of counsel arguments fail.

### III. JUDICIAL CONDUCT

¶50 Finally, Knotek argues that the trial court engaged in judicial misconduct in (1) failing to call a recess or to inquire whether she needed to speak with her attorney when she was "upset" and "under duress" and (2) ignoring

---

[13] In *Alford*, 400 U.S. 25, the United States Supreme Court held, "An individual accused of a crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id.* at 37. In *State v. Newton*, 87 Wn.2d 363, 552 P.2d 682 (1976), our state Supreme Court adopted the *Alford* rationale and held that a guilty plea from a defendant who maintains his or her innocence is constitutionally valid if there is sufficient evidence to support a jury verdict of guilty, *id.* at 370-71, and the plea is " 'a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " *Id.* at 372 (quoting *Alford*, 400 U.S. at 31).

that, by entering an *Alford* plea, she was not admitting guilt. These arguments also fail.

¶51 First, Knotek asserts in her SAG that the trial court must have heard her saying she was not guilty when her counsel told her to say she was guilty. But, the record does not reflect such statements. Similarly, there is no indication in the record that Knotek protested her innocence before she pleaded guilty, as she alleges. Nor does Knotek further articulate how her emotional state was evident to the trial court so as to prompt additional questioning about whether she was entering her plea voluntarily. On the contrary, the record supports the trial court's conclusion that, after thorough dialogue with counsel and the trial court, Knotek entered her plea intelligently, voluntarily, and knowingly.

¶52 Second, the record shows that Knotek, both counsel, and the trial court clearly understood the nature of Knotek's *Alford* pleas. Numerous times throughout the proceedings, the parties and court discussed Knotek's *Alford* plea, the nature of which is reflected in her statement on plea of guilty. For example, immediately after Knotek pleaded guilty to both counts, the trial court noted, "[I]t's my understanding that she's making an *Alford* plea on each count." RP (June 18, 2004) at 21. And at sentencing, (1) Knotek articulated on the record her responsibility for the deaths, but not her guilt in causing them and (2) she explained to the trial court that she was not contesting the charges because that would just bring more pain.

¶53 Knotek has failed to allege sufficient facts to support her contention or to prompt additional review of her claim that the trial court committed misconduct. Thus, we do not further consider this argument.

¶54 Affirmed.

HOUGHTON, C.J., and VAN DEREN, J., concur.

Review denied at 161 Wn.2d 1013 (2007).