# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57252-4-II |
| Respondent, | |
| v. | |
| JAMAAL NATHANIEL WRIGHT, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J. — Jamaal Nathaniel Wright committed multiple assaults and no contact order violations against Mariah Gutierrez, with whom he was in an on-and-off dating relationship. Wright pleaded guilty to second degree assault, fourth degree assault, residential burglary, felony domestic violence court order violation, and two counts of postsentence violation of a no contact order. Each conviction included a domestic violence designation. Wright argues the trial court erred by accepting his guilty plea without determining whether he understood that each conviction included the domestic violence designation, which would impact his offender score. Thus, he argues his plea was not knowing, intelligent, or voluntary. Wright also asserts the trial court failed to ensure he understood the direct consequences of pleading guilty to domestic violence charges. We affirm.

## FACTS

Wright was in an on-and-off dating relationship with Gutierrez for several years. Wright and Gutierrez had a child in common. In 2021, no contact orders prohibited Wright from contacting Gutierrez in any way. That year, police responded to four separate incidents involving Wright and

Gutierrez. In January, Wright strangled Gutierrez and punched her in the face. In March, Wright struck Gutierrez in the face. In September, Wright broke into Gutierrez's home, punched her, and suffocated her to the point where she lost consciousness. In December, Wright assaulted Gutierrez and then followed her to her place of work. During December 2021 and January 2022, while Wright was in jail, he contacted Gutierrez through other people, attempting to convince Gutierrez to get the charges against him dropped.

Wright ultimately pleaded guilty to second degree assault, fourth degree assault, residential burglary, felony domestic violence court order violation, and two counts of postsentence violation of a no contact order. Both Wright's signed statement of defendant on plea of guilty and his offer and sentencing worksheet listed these charges, and next to each charge was the notation "DV/IP." Clerk's Papers (CP) at 70, 80. Wright's signed statement also said that he had a dating relationship with Gutierrez. Wright initialed next to the section stating, "If this is a crime of domestic violence, I may be ordered to pay a domestic violence assessment of up to $100.00." CP at 75. The document provided that Wright and the trial court judge would initial only the sections that applied to Wright.

Along with his signed statement, Wright filed a stipulation acknowledging three prior convictions from 2018, including fourth degree assault, interfering with the reporting of a domestic violation, and a no contact order violation. All of these offenses were designated "DV." CP at 83. Wright further stipulated that his offender score was 9 based on past and current offenses.

An offer and sentencing worksheet was also submitted as part of the plea agreement. In the worksheet, under the "Special Verdict/Findings" section, the box next to "crime of domestic violence" was checked. CP at 81. The worksheet also indicated that Wright agreed to the State recommending a domestic violence evaluation and follow-up treatment as part of his sentence.

The sentencing range was listed as follows: "87-116 months i/c (State would be adding DV Aggravator to all felony charges[)]." *Id.* The box indicating "DV doubler present" was also checked. *Id.*

At Wright's plea hearing, the trial court verified that Wright understood the rights he was giving up by pleading guilty. The trial court reviewed the standard sentencing ranges and maximum penalties for all six counts, and Wright agreed he understood them. Wright also verbally stipulated to his criminal history and offender score:

> THE COURT: I have a stipulation on prior record and offender score. On Page 3 of this document, I have the initials J.W. over the typed name of Jamaal Wright; is that your signature?
> THE DEFENDANT: Yes.
> THE COURT: And did you go over this with your attorney?
> THE DEFENDANT: Yes.
> THE COURT: And this is -- you agree that this is a correct and accurate assessment of your criminal history?
> THE DEFENDANT: Yes.

Verbatim Rep. of Proc. (VRP) (June 30, 2022) at 15. The trial court also confirmed that the State was charging second degree assault as a domestic violence crime: "And since this appears to be charged as a crime of domestic violence, do you understand that you may be required to pay a domestic violence assessment up to $100; do you understand that?" VRP (June 30, 2022) at 12. Wright replied, "Yes." *Id.*

The trial court confirmed that Wright reviewed the statement on plea of guilty with his attorney, stating, "Now, Mr. Wright, did you read this document or did your lawyer read it to you or was it a combination of both?" VRP (June 30, 2022) at 14. Wright responded, "Both." *Id.* The trial court also confirmed that Wright intended to stipulate to his criminal history and offender score and that both were correctly reflected in the plea.

The trial court found Wright's plea was knowing, intelligent, and voluntary and accepted the plea. Since Wright stipulated to prior domestic violence offenses and pleaded guilty to current domestic violence charges, this significantly increased his offender score. The trial court accepted the State's recommendation and sentenced Wright to 72 months of incarceration and 18 months of community custody with domestic violence treatment.

Wright appeals.

ANALYSIS

Wright argues that the trial court erred by accepting his guilty plea because it was not made knowingly, intelligently, and voluntarily. Specifically, Wright argues that the trial court failed to ensure that he knew he was pleading guilty to domestic violence charges and that he understood the direct consequences of the domestic violence designations. We affirm the trial court's acceptance of Wright's guilty plea.

Generally, we "may refuse to review any claim of error [that] was not raised in the trial court." RAP 2.5(a). However, voluntariness of a guilty plea is a constitutional error that a defendant can raise for the first time on appeal. *State v. Knotek*, 136 Wn. App. 412, 422-23, 149 P.3d 676 (2006).

Due process requires that guilty pleas be made knowingly, intelligently, and voluntarily. *State v. Mendoza*, 157 Wn.2d 582, 587, 141 P.3d 49 (2006). A defendant must be correctly informed of all direct, but not collateral, consequences of their guilty plea. *State v. Ross*, 129 Wn.2d 279, 284, 916 P.2d 405 (1996). A guilty plea "based on misinformation regarding a direct consequence" of the plea can be considered involuntary. *Mendoza*, 157 Wn.2d at 591. A direct consequence is one that "'represents a definite, immediate and largely automatic effect on the

range of the defendant's punishment.'" *Id.* at 588 (internal quotation marks omitted) (quoting *Ross*, 129 Wn.2d at 284). The defendant's knowledge of the direct consequences of the guilty plea can be ascertained "from the record of the plea hearing or clear and convincing extrinsic evidence." *Ross*, 129 Wn.2d at 287. We consider the totality of the circumstances. *State v. Snider*, 199 Wn.2d 435, 444, 508 P.3d 1014 (2022).

For example, where the State incorrectly told a defendant who pleaded guilty that mandatory community placement would not apply to him, the Washington Supreme Court held that mandatory community placement was a direct consequence, and the mistake rendered the guilty plea invalid. *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 302, 88 P.3d 390 (2004). Similarly, where a defendant's correct standard range was actually higher than that stated in the guilty plea, the court held the plea was involuntary. *State v. Walsh*, 143 Wn.2d 1, 4-5, 8, 17 P.3d 591 (2001).

In contrast, the possibility of habitual criminal proceedings was a collateral, as opposed to direct, consequence of the plea because the State had discretion as to whether to initiate the proceeding, which involved a later, independent trial. *State v. Barton*, 93 Wn.2d 301, 305-06, 609 P.2d 1353 (1980). Similarly, in *State v. Ward*, the Washington Supreme Court held that the duty to register as a sex offender was a collateral consequence of a guilty plea because this duty did not "alter the standard of punishment." 123 Wn.2d 488, 514, 869 P.2d 1062 (1994).

Here, the totality of the circumstances show that Wright's guilty plea was entered knowingly, intelligently, and voluntarily. Specifically, the signed statement on plea of guilty, offer and sentencing worksheet, written stipulation, and plea hearing all show that Wright understood he was pleading guilty to domestic violence charges. In Wright's signed statement and in the

written stipulation, a "DV" designation accompanied every current and past offense listed. CP at 70, 83. Even if Wright did not know that "DV" stood for domestic violence, the offer and sentencing worksheet also had the box next to "crime of domestic violence" checked. CP at 81. It indicated a "DV doubler" applied. *Id.* The worksheet also indicated that Wright agreed to the State recommending a domestic violence evaluation and follow-up treatment as part of his sentence. Wright initialed next to the section of the plea agreement stating, "If this is a crime of domestic violence, I may be ordered to pay a domestic violence assessment of up to $100.00." CP at 75. Further, at the plea hearing, the trial court specifically stated, in regards to the second degree assault charge, "And since this appears to be charged as a crime of domestic violence, do you understand that you may be required to pay a domestic violence assessment up to $100; do you understand that?" VRP (June 30, 2022) at 12. Wright responded, "Yes." *Id.* Thus, the record shows that Wright understood that he was pleading guilty to domestic violence charges.

The record also shows that Wright understood the direct consequences of pleading guilty to domestic violence charges. In the offer and sentencing worksheet and at the plea hearing, Wright stipulated to his offender score, which included additional points because of the domestic violence designations. The trial court also reviewed the standard sentencing range and maximum penalty for each offense, and Wright agreed he understood each. Wright does not argue that the standard range in the plea agreement was incorrect. He also does not argue that the offender score he stipulated to was incorrect. He asserts that because he pleaded guilty to domestic violence charges, his offender score increased substantially. *See* former RCW 9.94A.525(21)(a) (2021) (requiring certain prior domestic violence convictions to count for two points if the current conviction is for

a felony domestic violence offense). But Wright does not dispute that he stipulated that 9 was his correct offender score. *See* CP at 83; VRP (June 30, 2022) at 15.

Unlike a defendant who is misinformed about mandatory community placement or misled as to the correct standard range, Wright's lack of knowledge regarding *how* the score was calculated did not have "'a definite, immediate and largely automatic effect on the range of'" his punishment. *Ross*, 129 Wn.2d at 284 (quoting *Barton*, 93 Wn.2d at 305). Wright was never misinformed about his offender score or the standard sentencing ranges. The offender score and sentence the trial court imposed were the ones he was fully informed about. Therefore, his plea was not involuntary.

## CONCLUSION

Because the trial court did not err in accepting Wright's guilty plea, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Lee, J.

Veljacic, J.