# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>JASON CRAIG WILKS,<br><br>                Petitioner. | No. 55357-1-II<br><br><br><br>UNPUBLISHED OPINION |

CRUSER, A.C.J. – Jason Wilks seeks relief from his convictions for third degree child rape, second degree child molestation, third degree child molestation, delivery of a controlled substance to a minor, and furnishing liquor to a minor. Wilks filed a timely personal restraint petition (PRP) in which he claims that he was denied effective assistance of counsel on several bases, including when his trial counsel failed to properly communicate regarding plea negotiations, when counsel failed to interview his family members and adequately prepare for trial, when counsel failed to investigate possible impeachment evidence, and when counsel failed to seek funds to cover expenses for an expert witness. Wilks also claims that there was insufficient evidence to support his convictions for unlawful delivery of a controlled substance to a minor.

Regarding Wilks' claim that defense counsel failed to advise him of the sentencing consequences during plea negotiations, including the possibility of consecutive sentences, sentencing enhancements, and exceptional sentences, we cannot fully determine on this record whether Wilks in fact was not so advised. Therefore, we remand that claim to the superior court

for an evidentiary hearing to determine the facts necessary to decide the issue of whether defense counsel failed to advise Wilks of the sentencing consequences during plea negotiations, as well as to make a determination on the merits of this portion of Wilks' PRP.[1] We hold that Wilks' remaining arguments fail. Accordingly, we deny Wilks' PRP in part and remand in part.

FACTS

I. BACKGROUND

In 2016, Wilks was charged with two counts of third degree child rape, one count of second degree child molestation, five counts of third degree child molestation, three counts of unlawful delivery of a controlled substance to a minor, and five counts of furnishing liquor to a minor. These crimes were committed against the teenaged friends of his daughter, SW.

II. AUGUST 2016 REARRAIGNMENT HEARING

In the months leading up to trial, the State sent Wilks' trial counsel an email with a plea offer, which defense counsel apparently did not respond to. The State set a rearraignment hearing[2] and informed defense counsel via email that the plea offer would expire at the hearing, at which point the State would add more charges. In addition, the court ordered defense counsel to indicate at the hearing whether the plea offer had been conveyed to Wilks.

The rearraignment hearing was held on August 26, 2016, and Wilks was present with his counsel. The parties began by discussing the amended information, with the State explaining:

> It adds two additional victims. These victims have been known to Defense.
> And the Defense was made aware of the potential for this amendment early

---

[1] *See* RAP 16.11(b) and RAP 16.12.

[2] At this hearing, the State sought to amend the information. The parties and the record refer to this as a "rearraignment" hearing. *See, e.g.*, Verbatim Report of Proceedings (VRP) (Aug. 26, 2016) at 4.

on. . . . And once we have done the rearraignment, I did have -- or perhaps before -- we did need to address the issue of whether or not Defense has conveyed offers to the Defendant.

 . . .

MR. HEALY: Good afternoon, Your Honor. With respect to the latter issue, obviously I can't comment on any communications with respect to Mr. Wilks vis-à-vis myself. But I can indicate that Mr. Wilks had knowledge of the Amended Information prior to coming into court this afternoon, has reviewed it, and Mr. Wilks has elected to proceed to trial.

 . . .

[THE COURT:] Now, as to the issue of communication of the offer, all I can say is that if there was a concern that the offer was made and transmitted to Mr. Wilks, Mr. Healy appropriately declined to discuss any communications he's had with his client. But it is now on the record that the State has transmitted an offer and this offer was transmitted to Mr. Healy.

MR. HEALY: I can convey that in my opinion I have done nothing but due diligence with respect to this matter.

THE COURT: And if you acknowledge receipt of the offer from the State -- what was the date?

MR. HEALY: I acknowledge receipt of the offer.

THE COURT: Then that's it. I'm good with that.

[THE STATE:] And I just wanted to make a record. And I don't think any response is required or ruling is required. But I just want to note that the Defendant -- I just want to maybe put Defense on notice that upon conviction, the Defendant could go to prison for life.

The offer was for a determinate sentence. And I only mention that so that our record is clear for the Court of Appeals should this particular issue come before them.

MR. HEALY: And I am cognizant of the maximum penalty. I am cognizant of the standard range that is potentially involved with respect to Mr. Wilks. And I'm cognizant of what the offer is and the fact that the offer did involve a determinate sentence.

No. 55357-1-II

VRP (Aug. 26, 2016) at 3-6. Wilks left the hearing during discussion of discovery issues, but he was present during the discussions described here. The case proceeded to trial the following month.

### III. MOTIONS IN LIMINE

During motions in limine, defense counsel inquired to what extent Wilks could introduce evidence of the victims' "promiscuous conduct." VRP (Sept. 20, 2016) at 39. Wilks' position was that three of the victims "were engaged in promiscuous activity" with SW, and this conduct caused him and his wife, Katie,[3] to exclude the victims from their home and keep SW from spending time with them. *Id.* This activity included the exchange of photos and messages that were sexual in nature. Wilks also sought to introduce evidence that some of the victims had previously been sexually abused and that one of them started having consensual sex in seventh grade.

The trial court clarified that the parties were not to use the word "promiscuous." *Id.* at 41. The court allowed defense counsel to argue that the victims fabricated their allegations after Wilks had excluded the victims from his home due to their behavior, but that the details of the testimony would need to be addressed as the issues came up. The court ruled that evidence of nude photographs would not be admissible, but that this would not preclude Wilks from arguing that the conduct and communications between the teenagers became increasingly sexualized, and certain conduct may properly be used as impeachment evidence, depending on the victims' testimony. In addition, the court reserved ruling as to some of the prior sexual abuse of the victims, allowing Wilks "broad leave" to cross examine the witnesses if the State brought up one of the specific instances, and did not allow evidence of prior consensual sexual relations. *Id.* at 38.

---

[3] For clarity, this opinion refers to Wilks' wife by her first name. No disrespect is intended.

4

IV. TRIAL

At trial, the State argued that Wilks would provide alcohol and/or marijuana to the victims, who would then fall asleep in his bed. Wilks would then touch them inappropriately, while the victims were vulnerable and would likely "have a fuzzy memory later." VRP (Nov. 3, 2016) at 43. Wilks argued that he never provided alcohol or marijuana to any of the victims and that he never touched any of them inappropriately. The defense theory was that the victims made up their allegations against Wilks after he had excluded them from his home.

Each victim testified about Wilks' abuse. Relevant here, each of them testified that Wilks gave them marijuana while they were at his home to spend time with SW.

During LM's testimony, defense counsel sought to inquire about LM's sexuality and whether she had been in a romantic relationship with SW at the time of the abuse, but the trial court did not allow this inquiry. On direct examination for the State, Detective Sergeant Byron Brockway testified that LM had turned over a pair of her underwear that was booked into evidence. He later admitted that the underwear had never been sent to be analyzed for DNA evidence.

During cross examination of BS, defense counsel intended to ask whether she had been messaging boys on social media to discuss sex, prompting her exclusion from the Wilks residence. The trial court ruled that Wilks could inquire about behavior on social media that resulted in her exclusion from the house, but that counsel could only specifically ask about discussing sex if BS denied that she was not allowed to be at the house.

In addition, defense counsel informed the court that it intended to inquire about BS stealing items, including shoes, from the Wilks residence. The trial court prohibited inquiry about the alleged theft, but allowed defense counsel to ask generally about a falling out between BS and SW

and whether there were issues resulting in BS being excluded from the Wilks residence. A similar issue was raised when Wilks' daughter, SW, testified. Before the jury, SW stated that BS, MR, and RR were not allowed in her parents' bedroom. Outside of the presence of the jury, she explained that "[BS] was not allowed in my parents' room because she stole from me and my mom." VRP (Oct. 27, 2016) at 136. The trial court prohibited this testimony.

In the middle of trial, defense counsel informed the court that Wilks had received messages and Facebook posts from "Triz ThaKid," who had previously been in a relationship with LM. VRP (Oct. 10, 2016) at 10. The messages and posts included statements by LM that she and the other victims were lying about their allegations regarding Wilks, but an investigation by the State suggested that they were forged.[4] Defense counsel attempted to authenticate the messages and posts and filed a declaration from a computer forensic expert who had reviewed the documents at issue. The declaration stated that the expert needed more information to determine whether a message at issue was sent from LM's Facebook account, and that he could either obtain this information by subpoenaing Facebook or obtaining the username and password for her account. Ultimately, the State provided defense with a copy of the downloaded history of LM's Facebook account. The next day, defense counsel indicated that he would not be seeking to offer the evidence.

Wilks also testified in his defense. He stated that he never had any sexual contact with any of SW's friends. Wilks also testified that he found objectionable material on SW's phone,

---

[4] The State interviewed LM, who indicated that she did not write the posts or messages. In addition, a detective with the Pierce County Sheriff's department conducted a forensic analysis of LM's phone and concluded that the posts did not originate from the phone. Metadata associated with the messages and posts suggested that the documents had been opened in Photo Shop.

including inappropriate photos and messages, involving some of the victims. He later testified that, of SW's friends, he at some point had to make a rule that SW could not contact four: MR, LM, BS, and AB.

Wilks testified that he never gave alcohol or marijuana to any minors at his house. He had been prescribed medical marijuana to treat his back pain. Initially, he purchased medical marijuana from a dispensary and kept it in a safe in his home. He eventually began growing it at home, at first in his bedroom and then in the garage. But he testified that he never told any kids about the marijuana he was growing and never saw any of the kids in his bedroom with marijuana.

## V. CONVICTION AND SENTENCE

The jury convicted Wilks on all charges except for one count of third degree child rape. In addition, the jury made a special finding that three counts of unlawful delivery of a controlled substance to a minor and one count of furnishing liquor to minor were committed with sexual motivation.

Wilks' sentencing ranges and statutory maximums for each offense were as follows:

Count 2, second degree child molestation:
  Range: 87-116 months
  Statutory maximum: 120 months/$20,000 fine
  Sentence received: 116 months

Count 3, third degree rape of a child:
  Range: 60 months
  Statutory maximum: 60 months/$10,000 fine
  Sentence received: 60 months

Count 4, third degree child molestation:
  Range: 60 months
  Statutory maximum: 60 months/$10,000 fine
  Sentence received: 60 months

Count 5, unlawful delivery of a controlled substance to a person under age 18 with sexual motivation:

Range: 100+-120 months
Statutory Maximum: 120 months/$20,000 fine
Sexual Motivation enhancement: 18 months
Sentence received: 100 months on the base offense, plus 18 months

Count 6, furnishing liquor to a minor:

Range: 0-364 days/$5,000 fine[5]
Statutory maximum: 364 days
Sentence received: The sentence is unclear. The gross misdemeanor judgment and sentence (J&S) on the five counts of furnishing liquor to a minor imposed 120 days of confinement on count 6, consecutive to all other sentences, with the remaining gross misdemeanor sentences to run concurrently to all other sentences. But the order amending the felony J&S states that the sentence on count 6 was 10 months, consecutive to the felony sentence.[6]

Count 7, third degree child molestation:

Range: 60 months
Statutory maximum: 60 months/$10,000 fine
Sentence received: 60 months

Count 8, unlawful delivery of a controlled substance to a person under age 18 with sexual motivation:

Range: 100+-120 months
Statutory Maximum: 120 months/$20,000 fine
Sexual Motivation enhancement: 18 months
Sentence received: 100 months on the base offense, plus 18 months

Count 9, furnishing liquor to a minor:

Range: 0-364 days/$5,000 fine
Statutory maximum: 364 days
Sentence received: No record of any sentence imposed on this count

Count 10, third degree child molestation:

Range: 60 months
Statutory maximum: 60 months/$10,000 fine
Sentence received: 60 months

Count 11, furnishing liquor to a minor:

---

[5] RCW 66.44.270(1); RCW 9A.20.021(2).

[6] Wilks did not challenge this discrepancy in his sentence on count 6, either in his direct appeal or in this PRP.

Range: 0-364 days/$5,000 fine
Statutory maximum: 364 days
Sentence received: No record of any sentence imposed on this count

Count 12, third degree child molestation:
Range: 60 months
Statutory maximum: 60 months/$10,000 fine
Sentence received: 60 months

Count 13, unlawful delivery of a controlled substance to a person under age 18 with sexual motivation:
Range: 100+-120 months
Statutory Maximum: 120 months/$20,000 fine
Sexual Motivation enhancement: 18 months
Sentence received: 100 months on the base offense, plus 18 months

Count 14, furnishing liquor to a minor[7]:
Range: 0-364 days/$5,000 fine
Statutory maximum: 364 days
Sentence received: No record of any sentence imposed on this count

Count 15, third degree child molestation:
Range: 60 months
Statutory maximum: 60 months/$10,000 fine
Sentence received: 60 months

Count 16, furnishing liquor to a minor with sexual motivation:
Range: 0-364 days/$5,000 fine
Statutory maximum: 364 days
Sentence received: No record of any sentence imposed on this count

---

[7] Wilks' second amended information alleges that this crime (count 14) was committed with sexual motivation. The second amended information also alleges that count 16 was committed with sexual motivation. The misdemeanor J&S likewise reflects that two of the five furnishing liquor to a minor convictions had special findings of sexual motivation, although it does not delineate which counts contained these findings. The special verdict forms contain a special verdict for sexual motivation on count 16, but there is no special verdict form in the clerk's papers transmitted to this court for count 14. As such, we cannot determine if count 14 was found to have been committed with sexual motivation. This speaks to the overall lack of clarity in the sentencing documents in this case (see footnote 9 below).

The J&S reflects the following departures from the standard range: the sexual motivation enhancements were run consecutively to each other[8] as well as to the base sentence, adding 54 months to the highest of the standard range sentences, and counts 2 and 5 were ordered "to run consecutively to all counts," with the remainder of the felony counts to run concurrently. CP at 355. This totaled 270 months of confinement for Wilks' felony convictions, with an additional 10 months imposed on count 6, which is a gross misdemeanor, for a total confinement period of 280 months.[9]

## VI. APPEAL AND MANDATE

Wilks appealed his convictions, arguing that he was denied his right to present a defense, that he was denied his right to a jury trial, that the State committed prosecutorial misconduct, that there was insufficient evidence to support his convictions for two counts of unlawful delivery of a controlled substance to a minor, that cumulative error denied him the right to a fair trial, and that the trial judge was biased against him. *State v. Wilks*, No. 50287-9-II, slip op. at 1 (Wash. Ct. App. Apr. 23, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2050287-9-

---

[8] *See* RCW 9.94A.533(8)(b).

[9] The J&S in this case lacks clarity. As it relates to counts 2 and 5, it makes little sense to run count 5 consecutively to all other sentences when it was *not* run consecutively to count 2, for which the court imposed a greater sentence. The effect of this was that the supposedly "consecutive" sentence on count 5 was subsumed by the greater sentence on count 2 (116 months)—which is how the court arrived at a total of 270 months on the felony counts. CP at 354. We note, incidentally, that the "Findings of Fact and Conclusions of Law for Exceptional Sentence" contains the following order: "It is therefore appropriate to sentence the defendant to 116 months on Count II and 100 months on Count V, to run consecutively *to each other* and to all other counts." *Id.* 381. This language is inconsistent with both the language used on the J&S and with the number of months of confinement ordered by the court. Had the court intended to run counts 2 and 5 consecutively to *each other* as well as to all other counts, Wilks' total sentence would have been 380 months, not 280 months. The State, for its part, did not appeal Wilks' sentence and has never expressed any disagreement with the court's calculation of 280 months.

II%20Unpublished%20Opinion.pdf. We affirmed his convictions, and the mandate issued on November 12, 2019. *Id.* Wilks filed a timely PRP on November 12, 2020.

## DISCUSSION

### I. LEGAL PRINCIPLES

This court may grant relief to a personal restraint petitioner who is unlawfully restrained. RAP 16.4(a). "Relief by way of a collateral challenge to a conviction is extraordinary, and the petitioner must meet a high standard before this court will disturb an otherwise settled judgment." *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011).

A petitioner must demonstrate error to obtain relief through a PRP. *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 821, 408 P.3d 675 (2018). If the error was of constitutional magnitude, the petitioner must show actual and substantial prejudice from the error. *Id.* If the error was not of constitutional magnitude, the petitioner "must show the error represents a 'fundamental defect . . . that inherently resulted in a complete miscarriage of justice.' " *Id.* (alteration in original) (quoting *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013)). A personal restraint petitioner may not raise an issue that the court already considered and rejected on direct appeal "unless the interests of justice require relitigation of that issue." *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994). A petitioner cannot avoid this requirement by reframing a legal argument that was brought on direct appeal. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013).

A petitioner may obtain a reference hearing by presenting facts that, if proved, would establish prejudice sufficient for the court to grant relief. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 541-42, 397 P.3d 90 (2017). For facts outside of the record, " 'the petitioner must demonstrate

that he has competent, admissible evidence to establish the facts that entitle him to relief.' " *Yates*, 177 Wn.2d at 18 (quoting *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992)). This may include affidavits by individuals with relevant knowledge, or corroborative evidence, but the petitioner "may not simply state what he thinks those others would say." *Rice*, 118 Wn.2d at 886. "If a petitioner makes at least a prima facie showing of actual prejudice, but the merits of the contentions cannot be determined solely on the record, the court should remand the petition for a full hearing on the merits or for a reference hearing" under RAP 16.11(b) and RAP 16.12. *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983).

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

"[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). To prevail on a claim of ineffective assistance of counsel, a defendant must show "(1) that defense counsel's conduct was deficient, . . . and (2) that the deficient performance resulted in prejudice." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

Performance is deficient when it falls below an objective standard of reasonableness based on the record established at trial. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption that counsel did not perform deficiently, but this presumption can be overcome "where there is no conceivable legitimate tactic explaining counsel's performance." *Reichenbach*, 153 Wn.2d at 130. A defendant is prejudiced when " 'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the

proceedings would have been different.' " *State v. Grier*, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). We need not address both prongs of the test when the defendant's showing on one prong is insufficient. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

*1. Failure to Properly Communicate Regarding Plea Negotiations*

Wilks argues that he was denied effective assistance of counsel because defense counsel failed to convey plea offers by the State and erroneously informed Wilks that the greatest total term of confinement he could receive was 10 years. We disagree in part, but remand for a hearing on the merits in part on this claim.

Defense counsel is ethically obligated to discuss plea negotiations with the defendant. *In re Pers. Restraint of McCready*, 100 Wn. App. 259, 263, 996 P.2d 658 (2000); *State v. Holm*, 91 Wn. App. 429, 435, 957 P.2d 1278 (1998). This obligation includes communicating actual offers and providing enough information to allow the defendant to make an informed decision regarding whether to plead guilty. *McCready*, 100 Wn. App. at 263; *Holm*, 91 Wn. App. at 435. Furthermore, failure to advise a defendant of the possible consequences of rejecting a plea offer can constitute ineffective assistance of counsel. *McCready*, 100 Wn. App. at 263; *see also State v. Drath*, 7 Wn. App. 2d 255, 268, 431 P.3d 1098 (2018) (holding defendant was denied effective assistance when counsel misinformed her about the sentencing range she faced upon conviction at trial). For purposes of ineffective assistance, prejudice is established when the defendant shows a reasonable probability that, but for the attorney's deficient performance, he would have accepted a plea offer. *State v. Edwards*, 171 Wn. App. 379, 396-97, 294 P.3d 708 (2012).

*a. Communication of the Offer*

Wilks claims in the declaration attached to his PRP that "[Healy] never had conveyed any offer to [him]" and that the only time he had been made aware of a plea offer by the State was on the first morning of trial. PRP, app. G at 5. The internal inconsistency of these assertions notwithstanding, Wilks was present at the August 26 hearing at which the State moved to amend the information, at which time the State raised the issue of whether counsel had conveyed plea offers to Wilks. Without commenting on his communications with Wilks, defense counsel stated, "I can indicate that Mr. Wilks had knowledge of the Amended Information prior to coming into court this afternoon, has reviewed it, *and Mr. Wilks has elected to proceed to trial*." VRP (Aug. 26, 2016) at 4 (emphasis added). In response to the trial court's statement that "the State has transmitted an offer and this offer was transmitted to Mr. Healy," counsel responded that he had "done nothing but due diligence with respect to this matter." *Id.* at 5. Wilks' claims in his declaration are unsupported by the record, where the court specifically addressed the issue of whether defense counsel had conveyed the State's plea offers to Wilks. Moreover, Wilks' admission that he received and considered the offer conveyed to him on the morning of trial demonstrates that he did not suffer prejudice from any failure of his attorney to convey the earlier offer to him.[10]

*b. Failure to Properly Advise on Sentencing Consequences*

Wilks also claims in his declaration that defense counsel repeatedly told Wilks that the greatest total term of imprisonment he faced was 10 years, that counsel did not inform Wilks about

---

[10] Wilks states that the offer conveyed to him on the morning of trial was for seven years, which was even shorter than the State's offer in the months leading to trial.

the court's ability to run sentences consecutively by declaring an exceptional sentence,[11] and that he did not know that the State had charged any sentencing enhancements or what the sentencing consequences of those enhancements were. Wilks states that if he had known these details, he would not have elected to go to trial.

The State offers two arguments in response: (1) that because Wilks was present in court when the State commented at a pretrial hearing that he faced a life in prison after conviction, the record belies his claim that he believed the greatest total time of incarceration he faced after trial was 10 years; and (2) that Wilks' declaration in this PRP is not credible because it is self-serving. The State's arguments lack merit.

First, we can find no evidence in the record provided to us either in the direct appeal or in this PRP that Wilks faced a potential life sentence on any count. None of the crimes for which Wilks was charged are subject to a life sentence, either under RCW 9.94A.507 or any other statute. Wilks was charged with a combination of offenses that, individually, carried statutory maximum penalties ranging from 10 years in prison, 5 years in prison, and 364 days in jail. RCW 9A.20.021(2); RCW 66.44.270(1); PRP, app. A at 5. Because we find no support for the State's contention (which it repeats in its response to Wilks' PRP) that one or more of Wilks charges

---

[11] The exceptional sentence in this case was imposed pursuant to RCW 9.94A.535(2)(c), which allows a trial court to impose an exceptional sentence when "[t]he defendant has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished." Wilks' offender score on each of his felony offenses was 27.

carried a maximum penalty of life in prison, we have no basis on which to conclude that Wilks relied on this unsupported statement.[12]

Second, the State's assertion that Wilks' declaration is not credible because it is self-serving presupposes that this court can make credibility determinations, which it cannot. Credibility determinations must be made by a trier of fact. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). The State relies on *State v. Buckman*, 190 Wn.2d 51, 62, 409 P.3d 193 (2018), to argue that a petitioner's "bare allegation" that he would not have accepted a plea offer is flatly insufficient to establish prejudice. We believe the State misreads *Buckman*. In *Buckman*, our supreme court held that a defendant claiming that he would not have taken a plea offer had he received effective assistance of counsel at the plea stage can only establish prejudice when he demonstrates that "a rational person in his situation would more likely than not have rejected the plea offer and proceeded to trial." 190 Wn.2d at 69. Thus, assuming Wilks' claims about his discussions (or lack thereof) with his attorney regarding the consequences of his convictions are found credible by a trier of fact, he can obtain relief if a rational person in his situation would have accepted the plea offer and foregone trial had competent advice been provided.

We conclude that Wilks has made a prima facie showing that a rational person in his situation would more likely than not have accepted the plea offer had he been fully informed of the potential sentencing consequences following conviction after trial. Defense counsel, at the

---

[12] Although it is possible that the State was referring to a *de facto* life sentence, contemplating that perhaps the trial court would impose top of the range sentences on each count and run numerous sentences consecutively pursuant to RCW 9.94A.535(2)(c), the State never made any such clarification in Wilks' presence nor are there context clues in the record which would support this meaning.

pretrial hearing in which the State referenced the possibility that Wilks could be sentenced to life in prison, made vague statements that he (defense counsel) was aware of the maximum penalty, Wilks' potential standard range, and the fact that the offer was for a determinate sentence. But because we cannot resolve, on this record, whether defense counsel actually *informed Wilks* about the specific sentencing consequences he faced after trial, including the length of the enhancements, the fact that they must be served consecutively to the base sentence as well as to each other, and the possibility of an exceptional sentence under RCW 9.94A.535(2)(c) based on Wilks' potential for a very high offender score, we must remand this particular claim of error to the superior court for resolution through an evidentiary hearing and a determination on the merits.

We note that, because this remand is for a determination of the PRP on the merits pursuant to RAP 16.11(b) and 16.12, Wilks "may not raise any new issues already raised in the PRP or this opinion." *In re Pers. Restraint of Amos*, 1 Wn. App. 2d 578, 601, 406 P.3d 707 (2017). Upon conclusion of the hearing, "the superior court shall enter findings of fact and conclusions of law and an order deciding the petition" consistent with this opinion. RAP 16.12.

*2. Failure to Interview Wilks' Family Members and Adequately Prepare for Trial*

Wilks argues that he was denied effective assistance of counsel because defense counsel failed to interview Wilks' family members, Katie and SW, prior to them testifying at his trial. In his petition, he asserts that had counsel interviewed Katie and SW,

> he would have learned that [SW] had many girlfriends who visited her at the family residence and that the complaining witnesses were individuals who had been asked not to return to the Wilks residence because they had caused problems and were no longer welcome. For example, RR was told [ ] she was not welcome after she invited her boyfriend to visit her during a sleepover and engaged in a sexual act with him on the living room couch, leaving biological fluids on the sofa.

> Healy did not know about this because he had failed to follow up on information provided to him by petitioner . . .

PRP at 11 (internal citation omitted).

Even assuming that defense counsel was unaware of Wilks' allegations about RR, Wilks cannot demonstrate prejudice because he cannot show that the trial court would have admitted this highly prejudicial allegation. Defense counsel sought to admit evidence about the victims' conduct described above, such as the exchange of nude photos, BS stealing from the Wilks residence, some of the victims engaging in "promiscuous conduct" with SW, and that one of the victims began engaging in consensual sex when she was in seventh grade. VRP (Sept. 20, 2016) at 39. But counsel was ultimately unsuccessful in his attempt to have specific alleged prior bad acts of the victims admitted unless the evidence could properly be used as impeachment evidence. Indeed, the trial court's decision not to admit some this evidence was litigated by Wilks in his direct appeal. *Wilks*, slip op. at 14-18.[13] In light of the trial court's evidentiary decision, it is highly unlikely the trial court would have admitted specific evidence about the alleged sexual behavior of a particular victim. Moreover, Wilks does not show such evidence would have been relevant. If, in fact, the victims were angry with Wilks for his decision to exclude them from his home, the underlying reason for that exclusion does not make it more or less likely that the victims' claims were fabricated. Rather, this evidence would serve only the purpose of shaming and besmirching the victims for sexual behavior.

Additionally, the trial court allowed Wilks to fully argue his theory that the victims fabricated the allegations against Wilks as revenge for his exclusion of them from his home. *Wilks*,

---

[13] This court held that the evidence that Wilks argued was improperly excluded was either admitted or properly excluded. *Wilks*, slip op. at 16.

slip op. at 17. He was able to present evidence to support this theory in accord with the trial court's rulings through his own testimony that SW received inappropriate phots and messages from some of the victims. Although it does not appear that counsel sought to admit evidence that RR had engaged in a sexual act with her boyfriend at the Wilks residence, Wilks, as we note above, does not show that this specific information would have been admissible, given the court's evidentiary ruling.[14]

Therefore, Wilks' argument that counsel performed deficiently by failing to interview Katie and SW prior to trial fails because he cannot show that he was prejudiced by this alleged failure.

*3. Failure to Investigate Impeachment Evidence*

Wilks argues that he was denied effective assistance of counsel when he received texts "early in the trial"[15] pertaining to LM's alleged drug addiction and defense counsel "did nothing with the potentially significant evidence of significant impairment of LM's ability to accurately recall and relate the events at issue in this case." PRP at 17. We disagree.

Wilks appears to refer to his appendix O as containing the messages at issue. These messages allege that LM previously engaged in prostitution and that she had a drug addiction. The messages have no date or time stamp. If the messages at issue are, in fact, the messages included in appendix O, Wilks responded to the sender that the messages and photos he received "don't

---

[14] Further, Wilks testified that four of the five victims—MR, LM, BS, and AB—had been excluded from the Wilks residence. He did not testify that RR had been excluded, so his argument that RR was excluded for engaging in sexual activity on the Wilks' couch is contradicted by his own trial testimony.

[15] The messages were discovered and brought to the trial court's attention about three weeks after the trial began.

really show anything" and unless the sender "ha[d] something else that's not really useful." PRP, app. O at 7. If Wilks himself believed that the messages were not useful for him, he cannot establish that he was prejudiced when trial counsel did not pursue the information contained in the messages. Accordingly, if these are the messages Wilks argues should have been pursued by defense counsel, his claim of ineffective assistance on this basis fails.

If the messages at issue were the messages that defense counsel concluded he could not authenticate at trial, the record shows that these messages were discussed in depth at the trial court. Several weeks into trial, counsel stated, "over the weekend Mr. Wilks received several messages and Facebook posts" apparently involving statements by LM that the victims were lying about the allegations.[16] VRP (Oct. 10, 2016) at 10. But an investigation by the State revealed that the messages and posts may have been forged, and the defense hired its own expert to examine at the evidence at issue. After both investigations, and reviewing a downloaded copy of LM's Facebook account, defense counsel ultimately could not authenticate the evidence and did not seek to offer it.[17] If these are the messages Wilks argues should have been pursued by defense counsel, he has not shown that defense counsel did not "investigate and determine the admissibility of this evidence," which Wilks claims counsel had a duty to do. PRP at 17. Accordingly, his claim of ineffective assistance of counsel on this basis fails.

---

[16] Because of the different allegations in the messages, it is unclear if these messages and posts are linked to the messages provided in Wilks' appendix O. The messages have a different name for the sender, but it appears from the record that they are the same person, who was previously in a relationship with LM.

[17] In his reply, Wilks claims that defense counsel should have investigated the messages prior to the start of trial so that he would have had time to subpoena Facebook for the records. But his petition and the trial record indicate that the messages at issue were not received until after the trial began.

*4. Failure to Seek Funds to Cover Expenses for Expert Witnesses*

Wilks argues that he was denied effective assistance of counsel when defense counsel failed to seek funds to cover expenses for expert witnesses. We disagree.

Wilks claims that trial counsel should have contacted two experts—one to examine the DNA on undergarments that LM provided to detectives "which the State said came from his contact with her when she was in his bed," and one to testify about the possible effects of alcohol and/or marijuana on the victims. PRP at 18. He argues that when he asked counsel about these different experts, counsel responded, "Are you going to pay for this?" *Id.*

Regarding the DNA expert, the State never introduced evidence of any DNA results at trial. Rather, Detective Sergeant Brockway testified that the underwear LM provided to the officers was booked into evidence, but was never sent for DNA analysis. Therefore, to the extent Wilks contends that a test of the underwear would have failed to reveal the presence of his DNA, such a claim is irrelevant in light of the State not having asserted otherwise. Wilks cannot show that he was prejudiced by any failure to retain an expert to examine the DNA on LM's undergarments.

Regarding an expert to testify about the effects of alcohol and marijuana, Wilks' declaration states that, "had there been alcohol consumption in the amount described by the [teenage] girls, they likely would have suffered blackouts and significant impairment" and would not have been able to accurately recall their experiences. PRP, app. G at 7. This is not " 'competent, admissible evidence' " to establish that Wilks is entitled to relief. *See Yates*, 177 Wn.2d at 18 (quoting *Rice*, 118 Wn.2d at 886). Wilks does not include any evidence that he is an expert in the effects of alcohol. Nor does Wilks include a declaration from an expert who can testify about the effects of alcohol who, after reviewing the testimony of the victims in this case, would testify that

21

the victims would have experienced significant memory impairment. Wilks attempted to cure this lack of evidence by providing us with expert testimony from a *different trial* "as an example of the type of expert testimony that [defense counsel] should have offered at [Wilks'] trial." PRP, app. Q at 2. But Wilks "may not simply state what he thinks [ ] others would say" in lieu of a declaration from a prospective expert. *Rice*, 118 Wn.2d at 886. Wilks fails to make a prima facie showing that he was prejudiced by defense counsel's failure to retain an expert to testify about the effects of alcohol and marijuana on the teenage victims.

Wilks cannot demonstrate that he was denied effective assistance of counsel on this basis.

B. SUFFICIENCY OF THE EVIDENCE

Wilks argues that there was insufficient evidence to support his conviction for unlawful delivery of a controlled substance to a minor because the State offered no evidence to support that the substance he allegedly provided to the victims was, in fact, marijuana.[18] We disagree.

A conviction that is not supported by sufficient evidence results in unlawful restraint. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). In determining whether there is sufficient evidence to support a conviction, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (internal quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). This standard

---

[18] Wilks acknowledges that "this issue was raised to some degree on direct appeal," when this court addressed his argument that the evidence did not establish that he provided marijuana to BS and MR during the charging periods. Reply Br. of Pet'r at 28; *Wilks*, slip op. at 27. However, this court did not specifically address the argument that the State did not prove that the substance was marijuana. *Wilks*, slip op. at 27. This appears to be due to the fact that Wilks raised this issue for the first time in his reply brief.

" 'admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.' " *Id.* (quoting *State v. Walton*, 64 Wn. App. 410, 415, 824 P.2d 533 (1992)), *abrogated on other grounds by In re Pers. Restraint of Cross*, 180 Wn.2d 664, 327 P.3d 660 (2014)).

To the extent that Wilks' argument is clear, he relies entirely on WPIC 50.51[19] for his argument that the State failed to prove that the substance delivered was marijuana. He cites no statute or case law in support of his argument. But "WPICs are not the law; they are merely persuasive authority." *State v. Hayward*, 152 Wn. App. 632, 645, 217 P.3d 354 (2009).[20] Furthermore, Wilks' position at trial was not that the substance he allegedly provided to the victims was not marijuana. Rather, he maintained that he simply did not provide any illegal substances to the victims and any claim on their part that he did was yet another fabrication.

The victims testified that Wilks provided them marijuana, and Wilks admitted that he purchased, grew, and used marijuana. " 'A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.' " *Martinez*, 171 Wn.2d at 364 (quoting *Walton*, 64 Wn. App. at 415). Wilks fails to demonstrate that the evidence is insufficient to sustain his convictions for unlawful delivery of a controlled substance to a minor.

---

[19] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 50.51 (4th ed. 2016).

[20] Also of note, the portion of WPIC 50.51 that Wilks relies on, "[with a THC concentration greater than 0.3 percent on a dry weight basis]," is not required to be proven, as Wilks contends. He points to the note on usage indicate that the instruction should be used "when the charge is marijuana-based." PRP at 19. However, the notes only indicate this for possession charges, and they also instruct to "[u]se bracketed material as applicable." WPIC 50.51, note on use.

No. 55357-1-II

CONCLUSION

We remand for an evidentiary hearing and determination on the merits on the issue of whether Wilks' defense counsel failed to advise him of the sentencing consequences during plea negotiations, including the possibility of consecutive sentences, sentencing enhancements, and exceptional sentences. We hold that Wilks' remaining arguments fail. Accordingly, we deny Wilks' PRP in part and remand in part.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, A.C.J.

We concur:

WORSWICK, J.

VELJACIC, J.